Opinion for the Court filed by Circuit Judge KAVANAUGH, with whom Circuit Judge GRIFFITH joins.
Opinion concurring in part and dissenting in part filed by Circuit Judge PILLARD.
KAVANAUGH, Circuit Judge:
Kenya wanted to crack down on tax evasion. So it enlisted help from the Kenyan public. The Kenya Revenue Authority issued an ad promising monetary rewards in exchange for information about undisclosed taxes. Enticed by that offer, Kenyan private bank employee Peter Odhiambo blew the whistle on hundreds of accountholders with potential tax deficiencies. Kenya responded by making some rewards payments to Odhiambo. But Odhiambo claimed that he was entitled to more — millions more. When word got out that he was an informant, Odhiambo feared for his safety, and Kenyan officials helped him ultimately move to the United States as a refugee. Odhiambo then sued Kenya in federal district court in Washington, D.C., for breach of contract based on Kenya’s alleged underpayment of rewards to Odhiambo.
Under the Foreign Sovereign Immunities Act, foreign governments are immune from suit in U.S. courts unless the plaintiffs claim falls into one of the statute’s enumerated exceptions. See 28 U.S.C. § 1604. Odhiambo argues that his claims satisfy the FSIA’s waiver and commercial activity exceptions. But Kenya has not waived its immunity in U.S. courts “either explicitly or by implication.” Id. § 1605(a)(1). And Kenya’s alleged breach of contract — a contract that was offered, accepted, and performed in Kenya — lacks the connection to the United States required by the commercial activity exception to the FSIA. See id. § 1605(a)(2). We therefore conclude, as did the District Court, that the FSIA bars Odhiambo’s suit. We affirm.
I
For most of our Nation’s history, foreign sovereigns enjoyed virtually absolute immunity from suit in U.S. courts. See Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); The Schooner Exchange v. M’Faddon, 11 U.S. 116, 136-46, 7 Cranch 116, 3 L.Ed. 287 (1812) (Marshall, C.J.). That changed in 1952, when the State Department and then the courts adopted the “restrictive theory” of sovereign immunity. Under the restrictive theory, foreign states retain immunity for sovereign public acts but not for private commercial acts. See Republic of Austria v. Altmann, 541 U.S. 677, 689-91, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004); Verlinden, 461 U.S. at 486-88, 103 S.Ct. 1962. In the Foreign Sovereign Immunities Act of 1976, Congress codified the restrictive theory and further defined the scope of foreign sovereign immunity. See Pub.L. No. 94-583, 90 Stat. 2891. Since then, the FSIA has provided “the sole basis for obtaining jurisdiction over a foreign state in our courts.” Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); see Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 86 (D.C.Cir.2005). As the Supreme Court recently reiterated, the FSIA supplies a “comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.” Republic of Argentina v. NML Capital, Ltd., — U.S. -, 134 S.Ct. *34 2250, 2255, 189 L.Ed.2d 234 (2014) (quoting Verlinden, 461 U.S. at 488, 103 S.Ct. 1962).
Under the FSIA, a district court has subject matter jurisdiction over a suit against a foreign state if — and only if — the plaintiffs claim falls within a statutorily enumerated exception. See 28 U.S.C. §§ 1330(a), 1604, 1605. In other words, the FSIA exceptions are exhaustive; if no exception applies, the district court has no jurisdiction. See Saudi Arabia v. Nelson, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993); Peterson, 416 F.3d at 86.
Two FSIA exceptions are relevant to this case. The first is the waiver exception, which permits a suit when “the foreign state has waived its immunity either explicitly or by implication.” Id. § 1605(a)(1). The second is the commercial activity exception, which permits a suit when “the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.” Id. § 1605(a)(2).
The dispute here arises from an “Information Reward Scheme” developed by the Kenya Revenue Authority to enlist public cooperation in enforcing Kenya’s tax laws. The scheme “rewards persons who provide information as below:
• Information leading to the identification of hitherto undisclosed taxes — a reward amounting to 1 % of the tax identified [up to] a maximum of [100,-000 Kenyan shillings].
• Information leading to the recovery of hitherto undisclosed taxes — a reward amounting to 3% of the taxes collected.”
J.A. 16. In essence, the rewards program encouraged whistleblowers to come forward with information about tax evasion by offering them a share of the proceeds— not unlike our country’s False Claims Act or the common law qui tam action. See 31 U.S.C. §§ 3729-3733; Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 768 & n. 1, 774-77, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).
The rewards program had its intended effect on Peter Odhiambo, an auditor at a private Kenyan bank called Charterhouse Bank. In April 2004, Odhiambo turned over records implicating more than 800 accountholders in possible tax evasion. The Kenya Revenue Authority rewarded Odhiambo with an initial payment of 200,-000 Kenyan shillings (about $2,600). A year later, the Authority made an additional payment of roughly 250,000 Kenyan shillings (about $3,300).
At some point, Charterhouse apparently learned that Odhiambo was the informant behind the investigation. Odhiambo then reported receiving disquieting phone calls telling him to leave Kenya. He was also the victim of alleged police harassment, which he reported to the Kenya National Commission on Human Rights. Believing Odhiambo’s safety at risk, Kenyan officials supported his application for asylum in the United States. He was granted asylum and arrived here as a refugee in September 2006.
Before and after his relocation, Odhiam-bo insisted that Kenya owed him more money for the tips that he had provided about tax evasion at Charterhouse. Odhi-ambo pressed his claims through written correspondence and in face-to-face meetings with Kenyan officials in the United States. Still unsatisfied, Odhiambo sued *35 Kenya for breach of contract in federal district court in Washington, D.C. He sought approximately $24.5 million in damages to compensate him for Kenya’s alleged underpayment of rewards. See Odhiambo v. Republic of Kenya, 930 F.Supp.2d 17, 20-24 (D.D.C.2013) (Odhiambo I).
Kenya moved to dismiss Odhiam-bo’s complaint based on its sovereign immunity to suit in U.S. courts. The District Court agreed with Kenya that the FSIA bars the suit. See id. at 23-35. We review the District Court’s sovereign immunity determination de novo. See Cruise Connections Charter Management 1, LP v. Attorney General of Canada, 600 F.3d 661, 664 (D.C.Cir.2010).
II
Odhiambo invokes two FSIA exceptions to establish district court jurisdiction over his suit: the waiver and commercial activity exceptions. We consider each in turn.
A
Odhiambo first contends that the FSIA does not bar his suit because the waiver exception applies. The waiver exception provides in relevant part that sovereign immunity will not apply when a “foreign state has waived its immunity either explicitly or by implication.” 28 U.S.C. § 1605(a)(1).
In the district court, Odhiambo argued that Kenya had implicitly waived its sovereign immunity to suit in the United States by facilitating his asylum here. In essence, Odhiambo’s claim was that Kenya should not be allowed to collect both the benefits of his performance on the contract and the benefits of sovereign immunity while simultaneously reneging on its bargain and creating an environment in which he had to flee the country. The District Court rejected that conception of implicit waiver as inconsistent with the case law, which has found implicit waiver only where the foreign state had “at some point indicated its amenability to suit.” Odhiambo v. Republic of Kenya, 930 F.Supp.2d 17, 24 (D.D.C.2013) (Odhiambo I) (quoting Princz v. Federal Republic of Germany, 26 F.3d 1166, 1174 (D.C.Cir.1994)). Odhiambo does not renew this argument on appeal, so we do not consider it.
Odhiambo now claims that Kenya waived its sovereign immunity with respect to claims like his when it acceded to the 1951 Convention Relating to the Status of Refugees. We disagree for two alternative and independent reasons. First, in his submissions to the district court, Odhi-ambo did not mention the Refugee Convention, much less contend that Kenya’s accession constituted a waiver of sovereign immunity in U.S. courts. Odhiambo has therefore forfeited this argument. See World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1161 & n. 10 (D.C.Cir.2002). Second, even if we were to overlook Odhiambo’s failure to timely raise this argument, it would have little merit. The ambiguous and generic language of the Refugee Convention falls far short of the exacting showing required for waivers of foreign sovereign immunity. See id. at 1162. Indeed, the Supreme Court has explained that it cannot “see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts.” Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 442, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The waiver exception to the FSIA does not permit Odhiambo’s suit.
B
Odhiambo next relies on the commercial activity exception. That exception applies when
*36 the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
28 U.S.C. § 1605(a)(2).
1
Clause one of the commercial activity exception permits a suit against a foreign sovereign when the plaintiffs “action is based upon a commercial activity carried on in the United States by the foreign state.” Id, § 1605(a)(2). The FSIA in turn defines the phrase “commercial activity carried on in the United States by a foreign state” to mean “commercial activity carried on by such state and having substantial contact with the United States.” Id. § 1603(e). Thus, to invoke the district court’s jurisdiction under clause one, the plaintiffs claim must be “based upon some commercial activity by” the foreign state “that had substantial contact with the United States.” Saudi Arabia v. Nelson, 507 U.S. 349, 356, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (internal quotation marks omitted).
In the district court, Odhiambo alleged several instances of commercial activity by Kenya that had substantial contact with the United States, including the meetings that Kenyan officials held with him in the United States to discuss the disputed rewards. The problem for Odhi-ambo is that his breach-of-contract claim is not “based upon ” that activity. 28 U.S.C. § 1605(a)(2) (emphasis added). As the Supreme Court has explained, a claim is “based upon” commercial activity if the activity establishes one of the “elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.” Nelson, 507 U.S. at 357, 113 S.Ct. 1471. In other words, the alleged commercial activity must establish “a fact without which the plaintiff will lose.” Kirkham v. Société Air France, 429 F.3d 288, 292 (D.C.Cir.2005); see Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1146 (D.C.Cir.1994) (commercial activity unrelated to elements of claim is “legally irrelevant”). Odhiambo does not seriously contend that his meetings with Kenyan officials in the United States establish any fact without which his breach-of-contract claim will fail. He therefore cannot proceed under clause one.
On appeal, Odhiambo asserts a new twist. He contends that (i) Kenya’s rewards offer constitutes a commercial activity by a foreign state on which his claim is based, and (ii) the asserted commercial activity had substantial contact with the United States because of his meetings with Kenyan officials in the United States.[1] As an initial matter, Odhiambo failed to raise this argument in the district court and therefore has forfeited it. But even if we consider Odhiambo’s new theory, his interpretation of clause one is doubly flawed under our case law. First, our cases have held that mere business meetings in the United States do not suffice to create substantial contact with the United States for these purposes. See Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1513 (D.C.Cir.1988); Maritime International Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1109 (D.C.Cir. *37 1982). Second, our cases make clear that clause one requires a plaintiffs claim to be “based upon” the aspect of the foreign state’s commercial activity that establishes substantial contact with the United States. Our decision in Kirkham illustrates that rule. There, we considered a claim by an airline passenger who had purchased a ticket in the United States and alleged an injury negligently caused by an Air France employee in France. We did not, as Odhi-ambo proposes here, ask first whether her claim was based on commercial activity by France and then ask independently whether that commercial activity had substantial contact with the United States. Instead, reasoning from the Supreme Court’s decision in Nelson, we explained that the “sole question before us” was whether the plaintiffs negligence claim was based upon her ticket purchase in the United States — that is, whether her claim was based upon the aspect of the foreign state’s commercial activity that establishes substantial contact with the United States. Kirkham, 429 F.3d at 291; see Nelson, 507 U.S. at 356-58, 113 S.Ct. 1471. That is precisely the approach to clause one that Justice White articulated in his concurring opinion in Nelson. See Nelson, 507 U.S. at 364-65, 370, 113 S.Ct. 1471 (White, J., concurring).
Kirkham’s interpretation of Nelson is fatal to Odhiambo’s argument. As explained above, the only aspect of Kenya’s commercial activity that allegedly established substantial contact with the United States — his meetings with Kenyan officials in the United States — is not necessary to make out any element of his breach-of-contract claim. Recognizing as much, Odhiambo essentially concedes that Kirk-ham forecloses his argument. See Odhi-ambo Reply Br. 13, 16, 21-22. Odhiambo suggests that Kirkham was “implicitly overruled” by Permanent Mission of India to the United Nations v. New York, 551 U.S. 193, 127 S.Ct. 2352, 168 L.Ed.2d 85 (2007). Id. at 21. But that case had nothing to. do with the commercial activity exception. This panel must follow Kirk-ham. And in any event, Kirkham is correct. Clause one of the commercial activity exception does not permit Odhiambo’s suit.
2
Clause two of the commercial activity exception allows a suit against a foreign sovereign when the plaintiffs claim is based “upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere.” 28 U.S.C. § 1605(a)(2). Even assuming that Odhiambo alleged an act that fits that definition, Odhiambo’s clause two argument falters on the same grounds as his clause one argument: His breach-of-contract claim is not based upon any alleged “act performed in the United States in connection with” Kenya’s commercial activity. Cf. Nelson, 507 U.S. at 357, 113 S.Ct. 1471; Kirkham, 429 F.3d at 292; Goodman, 26 F.3d at 1145-46.
To be sure, Nelson, Kirkham, and Goodman interpreted the phrase “based upon” in clause one, not clause two. But the virtually identical statutory text and structure of clauses one and two lead us to conclude that “based upon” means the same thing in both clauses. See Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224, 232, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007); IBP, Inc. v. Alvarez, 546 U.S. 21, 34, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005). Indeed, although Odhiambo disagrees with our interpretation of “based upon” in clause one, he does not argue that those same words mean something different in clause two. And to the degree that the text leaves any ambiguity, the legislative history is “crystal clear” that clause two’s reference to acts “performed in the United States in connection with a com *38 mercial activity of the foreign state elsewhere” is “limited to those” acts “which in and of themselves are sufficient to form the basis of a cause of action.” Zedan, 849 F.2d at 1514 (quoting H.R. REP. NO. 94-1487, at 19 (1976), 1976 U.S.C.C.A.N. 6604); see S. Rep. NO. 94-1310, at 18 (1976), 1976 U.S.C.C.A.N. 1983 (same).
In sum, a suit against a foreign sovereign may proceed under clause two only if the “act performed in the United States in connection with a commercial activity of the foreign state elsewhere” establishes a fact without which the plaintiff will lose. See Nelson, 507 U.S. at 357, 113 S.Ct. 1471; Kirkham, 429 F.3d at 292. None of the acts cited by Odhiambo satisfies that test.
3
The closest question in this case arises from clause three of the commercial activity exception. Clause three permits a suit against a foreign sovereign when the plaintiffs claim is based “upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.” 28 U.S.C. § 1605(a)(2). We agree -with Odhi-ambo that his suit satisfies the first part of clause three: His claim is based upon the “act” of Kenya’s alleged breach of contract, which happened outside the United States in connection with the rewards offer — a presumptively commercial activity of the Kenyan government. The question remaining is whether Kenya’s alleged breach of the rewards offer caused a “direct effect in the United States” given that Odhiambo now resides in the United States.
The leading Supreme Court case on the meaning of “direct effect” is Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). In Weltover, the Supreme Court considered whether Argentina’s decision to delay payments on certain bonds caused a direct effect in the United States. The Court explained that “an effect is ‘direct’ if it follows as an immediate consequence of the defendant’s” activity. Weltover, 504 U.S. at 618, 112 S.Ct. 2160 (internal quotation marks omitted). The Court reasoned that Argentina’s delay of the bond payments caused a direct effect in the United States because the bond contract had established the United States as a “place of performance.” Id. at 619, 112 S.Ct. 2160. More specifically, the contract provided for payment in U.S. dollars and directed investors to elect one of four payment locations, including New York. Thus, at the moment the contract was formed, Argentina assumed “contractual obligations” to pay the bondholders in New York (or one of the three other designated locations). Id. The investors in Weltover chose New York as their place of payment, and Argentina made payments to their New York accounts. See id. When Argentina breached its contractual obligations by failing to make bond payments that were “supposed to have been delivered to a New York bank,” its breach had a direct effect in the United States. Id.
Like Weltover, this Court’s direct effect cases involving alleged breaches of contract have turned on whether the contract in question established the United States as a place of performance. That approach follows from the text and purpose of the FSIA. By definition, breaching a contract that establishes the United States as a place of performance will have a direct effect here, whereas breaching a contract that establishes a different or unspecified place of performance can affect the United States only indirectly, as the result of some intervening event such as the plaintiffs move to this country. See Princz v. *39 Federal Republic of Germany, 26 F.3d 1166, 1172 (D.C.Cir.1994). Construing clause three to permit suits in that latter category would create an incentive for every breach of contract victim in the world to move to the United States, demand payment here, and then sue alleging a direct effect of nonpayment in the United States. That result would contradict the statutory term “direct” and undermine Congress’s objective of avoiding turning U.S. courts into “small international courts of claims.” Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 490, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (internal quotation marks omitted).
This Court’s decision in Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83 (D.C.Cir.2005), illustrates our place of performance rule and dictates our result here. In that case, an American who had worked in Saudi Arabia but resided in the United States claimed that he was contractually entitled to a refund of employee contributions that he had paid to the Saudi government. We held that Saudi Arabia’s alleged breach of the contract did not create a direct effect in the United States. Even though Peterson was in the United States at the time of the asserted breach, and even though the Court assumed that Saudi government “understood” as much, the contract included “no agreement — implied or express — that Peterson was to be paid in the United States.” Peterson, 416 F.3d at 90-91. On the contrary, the contract envisioned that the Saudi government would refund the employee’s money to him wherever he was when the payment came due. Of critical importance to our case, the Court in Peterson held that such a “pay wherever you are” arrangement does not suffice to create a direct effect in the United States. See id.
Likewise, in Goodman, this Court concluded that there was no direct effect where the foreign sovereign “might well have paid” its contract partner through a bank account in the United States but “might just as well have done so” outside the United States. Goodman, 26 F.3d at 1146-47. Similarly, in Zedan, the Court held that there was no direct effect when the allegedly breached contract required the foreign sovereign to “forward the money to” the other party “wherever he chose to travel.” Zedan, 849 F.2d at 1514.
In Cruise Connections Charter Management 1, LP v. Attorney General of Canada, 600 F.3d 661 (D.C.Cir.2010), this Court again observed that “harm to a U.S. citizen, in and of itself, cannot satisfy the direct effect requirement.” Cruise Connections, 600 F.3d at 665 (citing Zedan, 849 F.2d at 1515). The Court in that case went on to find a direct effect based on Canada’s alleged breach of a contract that required a U.S. company “to subcontract with two U.S.-based cruise lines” to provide ships during the Vancouver Olympics. Id. at 662. Because “the contract itself required the ships to come from” U.S.based cruise lines, Canada’s alleged breach “led inexorably to the loss of revenues” by the U.S. company in the United States, just as Argentina’s breach of the bond contract led to a loss of revenues for the investors who had designated New York as a place of payment in Weltover. Id. at 665.
Applying that same place of performance rule, this Court in de Csepel v. Republic of Hungary, 714 F.3d 591 (D.C.Cir. 2013), found that the plaintiffs had adequately alleged a direct effect in the United States by asserting that Hungary had breached a bailment contract obligating it to return artwork to individuals in the United States. The key to the Court’s reasoning was that Hungary had, in forming the bailment contract, “promised to perform specific obligations in the United *40 States.” de Csepel, 714 F.3d at 600-01. Thus, from the moment of contract formation, the United States was a contractually designated place of performance. The Court emphasized twice that Hungary “knew” the owners of the borrowed artwork “to be residing in the United States” at the time Hungary formed the bailment agreement. Id. at 601; see id. (Hungary “knew at all relevant times that the Her-zog Heirs owned the Herzog Collection and that certain of the Herzog Heirs resided in the United States”) (quoting Complaint ¶ 36) (emphasis added); De Csepel Br. 50 (“United States residents owned portions of the Herzog Collection” “at the time the bailments were created ” and Hungarian officials “knew that to be the case when they created bailment agreements ”) (emphases added). And the Court expressly contrasted Hungary’s promise to perform specific obligations in the United States with the facts of a case in which the Sixth Circuit declined to find a direct effect in the United States because the plaintiffs had not alleged that the foreign state “ever promised to deliver the art collection to the United States.” de Csepel, 714 F.3d at 601 (quoting Westfield v. Federal Republic of Germany, 633 F.3d 409, 415 (6th Cir.2011)) (alteration omitted).
In short, Hungary’s knowledge — from the moment 'the bailment agreement was formed — that performing its contractual obligations would require it to return the artwork to owners in the United States was crucial to the Court’s finding of a “direct effect in the United States” and to its explanation of why the case was not covered by precedents such as Peterson. Indeed, the de Csepel Court cited Peterson immediately before explaining the relevance of Hungary’s knowledge at the time it formed that contract that the owners of the artwork were residing in the United States. See id. (quoting Peterson, 416 F.3d at 90). We see no indication that the de Csepel Court intended to (or did) depart from Peterson or our other “direct effect” precedents in any way.
To summarize, this Court’s cases draw a very clear line: For purposes of clause three of the FSIA commercial activity exception, breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States.
In presenting his case for a direct effect, Odhiambo does not argue that his U.S. presence or U.S. citizenship alone suffices to create a direct effect in the United States. As explained above, the relevant precedents would foreclose any such contention. See, e.g., Cruise Connections, 600 F.3d at 665 (citing Zedan, 849 F.2d at 1515); Peterson, 416 F.3d at 90-91. Instead, Odhiambo tries to model his claim on de Csepel by suggesting that the contract established or necessarily contemplated the United States as a place of performance. But nothing in Kenya’s rewards offer suggested that the United States might be a place of performance. If the contract designated any place of performance, that place would be Kenya, because the contract expressly provided that rewards would be paid in Kenyan shillings. See J.A. 16; cf. Weltover, 504 U.S. at 609, 619, 112 S.Ct. 2160 (noting that Argentine bond contract that created direct effect in the United States provided for payment in U.S. dollars). Otherwise, the contract simply established the kind of “pay wherever you are” arrangement that we have repeatedly held — particularly in cases like Peterson — insufficient to cause a *41 direct effect in the United States. Put another way, no one could look at Kenya’s rewards offer and reasonably conclude that Kenya “promised to perform specific obligations in the United States” or was “supposed to” pay recipients in the United States, de Csepel, 714 F.3d at 600-01; Weltover, 504 U.S. at 619, 112 S.Ct. 2160; Peterson, 416 F.3d at 90; Goodman, 26 F.3d at 1146. Kenya’s alleged breach of its obligations therefore did not create a direct effect in the United States. On the contrary, as the District Court found, the effect in the United States arose only after a variety of intervening events, including the unveiling of Odhiambo’s role as a whistleblower, Odhiambo’s phone call to a Kenyan newspaper and the subsequently published story, Odhiambo’s outreach to Kenya’s Human Rights Commission, and Odhiambo’s move to the United States as a refugee. See Odhiambo I, 930 F.Supp.2d at 32. In our view, we could not rule for Odhiambo on this point without departing substantially from our precedents. See Princz, 26 F.3d at 1172 (a direct effect “has no intervening element, but, rather, flows in a straight line without deviation or interruption”) (internal quotation marks omitted).
In reaching that conclusion, we also note an Eleventh Circuit precedent on a factually similar question. See Guevara v. Republic of Peru, 608 F.3d 1297 (11th Cir. 2010) (Guevara II). In Guevara II, Peru issued a public reward offer in return for information that would directly enable the locating and capture of a high-profile fugitive. During a trip to Miami, one of the fugitive’s associates, Guevara, gave up the fugitive’s location to the FBI and demanded the reward. When the Peruvian government refused to pay, Guevara sued for breach of contract in South Florida’s federal court. The Eleventh Circuit concluded that Peru’s alleged breach of the reward offer did not cause a direct effect in the United States. See id. at 1300-02, 1309-10. In short, Guevara’s mere presence in the United States and demand for payment here did not suffice to create an effect arising directly from the breach of a contract offered in Peru that never established or contemplated the United States as a place of performance. So too here.[2]
Odhiambo alternatively contends that Kenya modified the contractual place of performance by helping him resettle in the United States and knowingly making payments that reached him here. That contention falters on multiple fronts.
First, Odhiambo failed to allege any payments in the United States in his first amended complaint — or at any time prior to the District Court’s judgment — even though he apparently received those payments years before he filed his complaint. The District Court therefore did not need to consider those allegations. See Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n. 5, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008).
Second, even if we were to consider Odhiambo’s allegations, they do not demonstrate that Kenya manifested the consent necessary to modify the contract. Odhiambo offers no reason to believe that Kenya’s assistance in his asylum application had any impact on the place of performance designated in the rewards offer. *42 Although Kenya knows that Odhiambo is in the United States, that alone does not suffice. Kenya has not, in the words of de Csepel, “promised to perform specific obligations in the United States.” de Csepel, 714 F.3d at 600-01. Indeed, far from agreeing with Odhiambo that the contract designates the United States as a place of performance, Kenya has continually refused to issue any payments outside Kenya. Odhiambo has therefore received the payments in the United States only through an intermediary in Kenya who obtained the payments in Kenya and then sent them to Odhiambo. Again, that is a far cry from de Csepel, in which the contract never envisioned performance anywhere other than the United States. See id.
Third, Odhiambo’s allegation that he received a payment from the Kenyan government through the Kenyan intermediary while he was in Tanzania further undercuts his claim that the United States was a contractually designated place of performance. In short, the evidence shows this: When Odhiambo was in Kenya, Kenya made payment in Kenya. When Odhiam-bo was in Tanzania, Kenya made payment to an intermediary in Kenya, and that intermediary later transferred the money to Odhiambo in Tanzania. When Odhiam-bo was in the United States, Kenya made payment to an intermediary in Kenya, and that intermediary later transferred the money to Odhiambo in the United States. If Odhiambo were to move somewhere else, we see no reason to doubt that Kenya would make any further payments in Kenya, and that the money would be transferred by an intermediary to Odhiambo in his new locale. That record further buttresses the conclusion that the contract operated precisely as the kind of “pay wherever you are” arrangement that we rejected as a basis for jurisdiction over foreign states in Peterson and Goodman.
Odhiambo nonetheless suggests that our direct effect analysis should apply differently here because Kenya arranged for him to seek asylum in the United States. See Odhiambo Br. 50; Odhiambo Reply Br. 25-26. Under his theory, refugees would be allowed to bring suits in U.S. courts against their former sovereigns if those sovereigns played a role in the refugees’ relocation to the United States. Whatever the wisdom of that proposed refugee exception as a policy matter, the FSIA does not recognize it. So neither can we. We must adhere to the text of the statute, especially in FSIA cases. See Republic of Argentina v. NML Capital, Ltd., — U.S. -, 134 S.Ct. 2250, 2255-56, 189 L.Ed.2d 234 (2014). As we explained above, the FSIA is the sole way for a plaintiff suing a foreign sovereign to invoke the jurisdiction of U.S. courts, and the exceptions enumerated by the FSIA are exhaustive. See Nelson, 507 U.S. at 355, 113 S.Ct. 1471; Peterson, 416 F.3d at 86; cf. Law v. Siegel, — U.S. -, 134 S.Ct. 1188, 1196, 188 L.Ed.2d 146 (2014) (enumeration of exemptions “confirms that courts are not authorized to create additional exceptions”). In other words, any claim to a FSIA exception “must stand on the Act’s text. Or it must fall.” NML Capital, 134 S.Ct. at 2256. Odhiambo’s proposed refugee exception cannot stand on the FSIA’s text. So it must fall.
To be sure, Congress and the President of course may enact new legislation to amend the FSIA and include an exception of the kind that Odhiambo proposes. But until then, the role of this Court “is to apply the statute as it is written — even if we think some other approach might accord with good policy.” Burrage v. United States, — U.S. ——, 134 S.Ct. 881, 892, 187 L.Ed.2d 715 (2014) (internal quotation marks and alterations omitted); see NML Capital, 134 S.Ct. at 2258 (“[t]he question *43 ... is not what Congress ‘would have wanted’ but what Congress enacted in the FSIA”) (quoting Weltover, 504 U.S. at 618, 112 S.Ct. 2160).
None of the FSIA exceptions asserted by Odhiambo applies to this case. His suit therefore cannot proceed. We affirm the judgment of the District Court.[3]

So ordered.

. The District Court assumed without deciding that the rewards offer was a commercial activity. See Odhiambo v. Republic of Kenya, 930 F.Supp.2d 17, 26 (D.D.C.2013) (Odhiam-bo I). Kenya appears to accept that premise on appeal.

. Odhiambo relies on the Ninth Circuit's decision finding a direct effect in Adler v. Federal Republic of Nigeria, 107 F.3d 720 (9th Cir. 1997). But in Adler, the contract expressly required the investors to designate an out-of-country location of payment. See Adler, 107 F.3d at 727. Here, by contrast, nothing in Kenya's rewards offer allowed — much less required — claimants to demand payment in particular locations. So even if we agreed with the Ninth Circuit's looser approach to the direct effect prong of the analysis, we would still conclude that Odhiambo’s suit does not fall within clause three under Adler.

. The District Court did not abuse its discretion in denying Odhiambo's motion for reconsideration and leave to file a second amended complaint. Odhiambo’s only plausible argument was that he had new evidence, but the District Court reasonably concluded that the evidence was not new. See Odhiambo v. Republic of Kenya, 947 F.Supp.2d 30 (D.D.C. 2013) (Odhiambo II); see also Ciralsky v. CIA, 355 F.3d 661, 668, 671-73 (D.C.Cir.2004).