# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 13, 2024          Decided July 16, 2024

No. 23-7009

WYE OAK TECHNOLOGY, INC.,
APPELLEE

v.

REPUBLIC OF IRAQ AND MINISTRY OF DEFENSE OF THE
REPUBLIC OF IRAQ,
APPELLANTS

———

Consolidated with 23-7013

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01182)

———

*Boaz S. Morag* argued the cause for appellants/cross-appellees. With him on the briefs was *Nowell D. Bamberger*.

*Neal Kumar Katyal* argued the cause for appellee/cross-appellant. With him on the briefs were *C. Allen Foster*, *William E. Havemann*, and *Reedy C. Swanson*.

Before: MILLETT and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In late-summer 2003, a small American company named Wye Oak Technology, Inc. entered into a contract with the Iraqi Ministry of Defense to rebuild Iraq's largely destroyed military, with the cost financed by Iraq. Wye Oak performed successfully under the contract for nearly five months. But Iraq refused to pay and gave the promised money to someone else. When Wye Oak's owner flew to Iraq to try to obtain the payment due, he was shot and killed by unidentified assailants. Wye Oak eventually closed shop in Iraq with the payment dispute still unresolved.

Years later, Wye Oak sued Iraq in a United States federal district court for breach of contract. After a decade of litigation, the district court awarded Wye Oak more than $120 million in damages.

On appeal, Iraq does not dispute that it breached its agreement with Wye Oak. It argues instead that it is completely immune from suit and that, alternatively, the district court's damage award was too high. Wye Oak, for its part, contends that the damage award was too low.

Whatever the merits of the damages dispute, we cannot reach it. Iraq is immune from suit, so we have no jurisdiction. We accordingly reverse the district court's judgment and remand for dismissal of the case.

3

**I**

**A**

Under the Foreign Sovereign Immunities Act ("FSIA"), a foreign state is immune from civil suit in the United States unless the suit falls under one of the Act's enumerated exceptions. 28 U.S.C. § 1604; *Verlinden v. Central Bank of Nigeria*, 461 U.S. 480, 488–489 (1983).

The "most significant" of these exceptions is the "commercial" exception. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). It provides that a foreign state is not immune when the action is based

> [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).

Only the third clause of the commercial exception is at issue here. To establish a statutory exception to Iraq's sovereign immunity under that clause, Wye Oak must show that its lawsuit is (1) based on an act by the foreign state outside the United States; (2) that was taken in connection with commercial activity; and (3) that caused a direct effect in the United States. 28 U.S.C. § 1605(a)(2); *Weltover*, 504 U.S. at 611.

The first two elements of that test have already been resolved in Wye Oak's favor. In a prior appeal in this case, we held that this lawsuit is based on an act that occurred outside the United States because Iraq breached its contract with Wye Oak to pay Wye Oak in Iraq for work performed in Iraq. *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 703 (D.C. Cir. 2022) (*Wye Oak II*). We also held that the breach was connected to a commercial activity because Iraq contracted with a private entity, Wye Oak, for military reconstruction services. *Id.*

Before us is the remaining jurisdictional question of whether Iraq's breach "cause[d] a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2).

To answer that question in Wye Oak's favor, we would have to find an effect in the United States that had "no intervening element, but rather, flow[ed] in a straight line without deviation or interruption" from the breach in Iraq. *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (quotation marks omitted); *Weltover*, 504 U.S. at 618 ("[A]n effect is direct if it follows as an immediate consequence of the defendant's activity.") (formatting modified).

**B**

In the early 2000s, the United States led a multi-national military coalition that toppled Saddam Hussein's government in Iraq. *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-01182, 2019 WL 4044046, at *3 (D.D.C. Aug. 27, 2019) (*Wye Oak I*). The coalition then handed over power to an interim Iraqi government. *Id.*

As the United States worked to transition Iraq's governance to Iraqi politicians and voters, it also worked to hand over military security to Iraqi armed forces. *Wye Oak I*, 2019 WL 4044046, at *3. The invasion, though, had left Iraq's military structure, equipment, and personnel in ruins.

In 2004, Wye Oak and its president, Dale Stoffel, contacted the Iraqi Ministry of Defense with a plan to inventory and assess Iraq's existing military equipment, refurbish what equipment it could, and sell the rest for scrap. *Wye Oak II*, 24 F.4th at 692. With the recommendation of U.S. military leaders in Iraq, the Ministry agreed. *Wye Oak I*, 2019 WL 4044046, at *4.

To implement that plan, the Ministry and Wye Oak signed a Broker Services Agreement in August 2004. *Wye Oak I*, 2019 WL 4044046, at *4. The Agreement made Wye Oak the "sole and exclusive Broker" for all matters related to refurbishing Iraqi military equipment or selling it as scrap. J.A. 479 (Broker Services Agreement). The Ministry agreed "not to conduct any Military Refurbishment Services or arrange for the use, sale or lease of any Refurbished Military Equipment provided for under th[e] Agreement nor engage in any scrap sales, except pursuant to an engagement with [Wye Oak] under th[e] Agreement." J.A. 479 (Broker Services Agreement). The Agreement also set out a payment process under which Wye Oak would submit invoices to the Ministry. The Ministry would then "make full payment on such invoice[s] immediately upon presentation * * * in the form and manner as directed by [Wye Oak]." J.A. 481 (Broker Services Agreement).

Wye Oak performed as promised under the Agreement. In Iraq, it worked with Dale's other company, CLI Corporation, to hire contractors, began its initial assessment of equipment, and prepared for refurbishment and scrap operations. *Wye Oak*

*I*, 2019 WL 4044046, at \*8. Back in the United States, Dale's brother David Stoffel managed some of the company's business affairs from West Virginia. *Id.* at \*8. He created a computer program to inventory and track all the equipment Dale was handling abroad, oversaw Wye Oak's electronic communications, and communicated with the Iraq-based members of Wye Oak to see what support they might need. *Id.* at \*15.

Several months into the agreement, Wye Oak presented the Iraqi Ministry of Defense with three invoices detailing its costs and the amount it charged for overhead and profit. *Wye Oak I*, 2019 WL 4044046, at \*9. Together, the invoices totaled nearly $25 million. *Id.* Wye Oak designated the Ministry's Baghdad office as the place of payment. *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-1182, 2022 WL 17820569, at \*6–7 (D.D.C. Dec. 20, 2022) (*Wye Oak III*); J.A. 489–491 (Invoices).

The Ministry agreed to pay. *Wye Oak I*, 2019 WL 4044046, at \*9. But it gave the money to a Lebanese businessman named Raymond Zayna instead. It did not pay a penny to Wye Oak. *See id.* at \*8, \*13–14.

Wye Oak pursued various efforts to secure payment. Dale flew back to the United States where he and David contacted several American officials to try to enlist support for Wye Oak's efforts. *Wye Oak I*, 2019 WL 4044046, at \*15. As a result of that outreach, a Senator contacted the State Department and asked for its assistance. *Wye Oak III*, 2022 WL 17820569, at \*15. The State Department talked to the Department of Defense. *Id.* The Department of Defense then met with Wye Oak and appointed a representative to advise the Ministry. *Id.*

In December, Dale flew back to Iraq to ensure Wye Oak's work remained on schedule and to try to resolve the payment issue. *Wye Oak I*, 2019 WL 4044046, at *16. When Dale arrived in Iraq, he attended a meeting with Ministry officials, Zayna, and U.S. military officers. *Id.* Everyone agreed that Zayna and the Ministry would give Wye Oak the money. *See id.* at *16–17. Dale then went on a tour of Iraq to survey Wye Oak's progress. *Id.* at *17.

Days later, Dale received word that payment was ready in Baghdad. He drove toward the city to receive it. *Wye Oak III*, 2022 WL 17820569, at *3. On the way, unknown assailants attacked his car and shot him and a companion to death. *Wye Oak I*, 2019 WL 4044046, at *17. All of Wye Oak's personnel then left Iraq permanently. *Id.* at *18.

Wye Oak kept managing its contractors in Iraq for a few weeks after Dale's death. But without payment, it soon had to cease all work in Iraq. *Wye Oak I*, 2019 WL 4044046, at *18–19. Back in the United States, David stopped developing his software program and monitoring electronic communications from Iraq. *Wye Oak III*, 2022 WL 17820569, at *12. Wye Oak cancelled multiple planned business ventures, including plans to subcontract some of its work to CLI, expand its U.S.-based computer infrastructure and personnel, and build an international support network focused on Eastern Europe. *Id.* at *10–13.

## C

### 1

Wye Oak sued Iraq in the Eastern District of Virginia for breach of contract. *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:09-cv-793, 2010 WL 2613323, at *1 (E.D. Va. June 29,

2010), *aff'd* 666 F.3d 205.  That court transferred the case to the United States District Court for the District of Columbia. *Id.*

The district court found Iraq liable after an eight-day bench trial.  *Wye Oak I*, 2019 WL 4044046, at *54.  The court first determined that Iraq bore responsibility for any breach of the Agreement by its Ministry of Defense.  *Id.* at *21.  The district court then held that it had jurisdiction under the commercial exception's second clause because it found that Wye Oak's suit was based on an act performed in the United States in connection with a commercial activity of the foreign state elsewhere.  *Id.* at *21–24.  The court did not address the exception's other clauses.  Turning to the merits, the district court found that Iraq had materially breached the agreement when it failed to pay money due under the three invoices.  *Id.* at *24–28.  It ordered Iraq to pay Wye Oak over $120 million. *Id.* at *54; *Wye Oak I*, Order, No.  553 (Nov. 15, 2019).

Iraq appealed and this court vacated the district court's judgment.  *Wye Oak II*, 24 F.4th at 703–704.  We held that the commercial exception's second clause did not apply to Wye Oak's breach-of-contract suit.  *Id.* at 702.  That clause, we explained, is triggered only when the foreign sovereign engages in action inside the United States, while Wye Oak's suit was based solely on Iraq's conduct in Iraq.  *Id.*

We then concluded that it was "plausible" that Iraq might lose immunity under the commercial exception's third clause. *Wye Oak II*, 24 F.4th at 703.  We held that the first two elements of that test were met because the suit was based on (1) an act outside the United States that (2) related to Iraq's commercial activity.  *Id.*  We remanded the case to the district court to develop a factual record to determine whether Iraq's breach

had a "direct effect" inside the United States. *Id.* (quoting 28 U.S.C. § 1605(a)(2)).

**2**

The district court developed the needed factual record and found that Iraq's breach had direct effects within the United States. *Wye Oak III*, 2022 WL 17820569.

At the outset, the court rejected a number of Wye Oak's claimed direct effects. It ruled that Iraq's failure to pay the money it owed into Wye Oak's Pennsylvania-based bank account did not cause a "direct effect" in the United States because nothing in the Agreement obligated Iraq to deposit the money in the United States. *Wye Oak III*, 2022 WL 17820569, at *5–8. The Agreement instead provided that Iraq would pay Wye Oak "immediately" upon receiving an invoice "in the form and manner as directed by [Wye Oak,]" J.A. 481, and the invoices Wye Oak submitted specified payment in Baghdad, J.A. 489–491 (Invoices); *Wye Oak III*, 2022 WL 17820569, at *7–8.

The court also found that Iraq did not "target" Wye Oak in the United States for a commercial relationship because Iraq did not take "any affirmative actions" in the United States to identify Wye Oak or solicit a contractual commitment. *Wye Oak III*, 2022 WL 17820569, at *8–9. Instead, Wye Oak approached the Iraqi government in Iraq about doing business for it in Iraq. *Id.* at *9. Regardless of whether Iraq might have anticipated that Wye Oak would feel some loss from the breach in the United States, the court held that was not enough to support jurisdiction. *Id.* at *10.

As for Wye Oak's argument that the breach interrupted its subcontract with U.S.-based CLI, the court reasoned that the

Agreement did not require that subcontract, and so its loss was not a direct effect of the breach. *Wye Oak III*, 2022 WL 17820569, at *10–11.

The district court, however, found that there were other direct effects in the United States. It noted that Wye Oak performed "a number of activities in the United States"— such as the development of inventory-tracking software and management of Wye Oak's electronic communications—in connection with its work under the Agreement. *Wye Oak III*, 2022 WL 17820569, at *12. Iraq's breach ground this domestic work to a halt. *Id.*

The court additionally found that the breach disrupted Wye Oak's "clear" plans to expand its operations in the United States to support its work for Iraq, and that Iraq knew "from the start of the relationship" how important this work was to Wye Oak's business. *Wye Oak III*, 2022 WL 17820569, at *12, *14. The court added that Iraq's failure to pay also stopped the frequent trips Dale and other Wye Oak employees made between the United States and Iraq and prevented Wye Oak from building a broad network across Eastern Europe for refurbishing Soviet-era military supplies. *Id.* at *13.

The court concluded by finding that Iraq's breach directly impacted U.S. diplomatic and military operations in the United States. *Wye Oak III*, 2022 WL 17820569, at *15. When Iraq did not pay, Wye Oak reached out to several U.S. officials in the United States for assistance, and some of those officials took steps—in the United States—to help. *Id.* at *15–16. According to the court, the breach also interfered with U.S. efforts to stand up a strong Iraqi military to replace the U.S. military in Iraq. *Id.* at *17–18. This interference, the court ruled, impacted policy decisions made in Washington about its readiness to withdraw American troops from Iraq. *Id.*

Having found jurisdiction under the commercial exception, the district court reentered its prior damages order with the numbers adjusted to account for increased interest. *See Wye Oak III*, Judgment, No. 553 (Dec. 20, 2022). Both parties appealed.

## II

We review the district court's factual findings for clear error. *Wye Oak II*, 24 F.4th at 700. We review its legal interpretation and application of the FSIA *de novo*. *Id.*

## III

Iraq loses its immunity to this lawsuit only if its breach of contract caused a direct effect in the United States. It did not. Iraq was the center of Wye Oak's entire commercial relationship with the Ministry, and Iraq is where the breach's direct effects occurred. As a result, the district court lacked jurisdiction over this suit, and so its judgment is vacated, and the case remanded with instructions to dismiss.[1]

---

[1] We address only whether the commercial exception's third clause applies to this case. Our earlier decision held that its second clause does not. *Wye Oak II*, 23 F.4th at 702. Wye Oak makes no argument that that the first clause is relevant here, and the district court did not rely on that clause either. That is unsurprising. In cases like this that involve "a contract executed and performed outside the United States," our analysis generally focuses only on the third clause, and nothing about the facts in this case warrants different treatment. *See Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 817 (D.C. Cir. 2015), *vacated on other grounds*, 581 U.S. 170.

12

**A**

The only jurisdictional question left in this case is whether Iraq's breach caused a direct effect in the United States. *See* 28 U.S.C. § 1605(a)(2). A "direct effect" is one that "follows as an immediate consequence" of the breach. *Weltover*, 504 U.S. at 618 (quotation marks omitted). Here, all of the immediate consequences of Iraq's breach were felt in Iraq, not the United States.

From the start, Wye Oak and the Ministry fully anchored their relationship in Iraq. Wye Oak approached the Iraqi Ministry of Defense, in Iraq, about doing business there. *Wye Oak III*, 2022 WL 17820569, at *9. Wye Oak and the Iraqi government negotiated the scope of that work and executed their Broker Services Agreement in Iraq. *Id*. The work involved rebuilding Iraqi military equipment for use by Iraq's armed forces. *Wye Oak I*, 2019 WL 4044046, at *5–6; J.A. 479 (Broker Services Agreement). The equipment was already in Iraq, and the maintenance and refurbishment work were to be performed there as well. *Wye Oak I*, 2019 WL 4044046, at *8; J.A. 479 (Broker Services Agreement). Wye Oak's personnel travelled to Iraq to visit its military bases and to assess their stores of weapons and equipment. *See Wye Oak III*, 2022 WL 17820569, at *13. Wye Oak hired contractors to come to Iraq to work at those bases. *Wye Oak I*, 2019 WL 4044046, at *8. And Iraq used the refurbished equipment in Iraq to help defend its people. *Id.* at *18–19.

The breach occurred in Iraq too. When the time came for payment, Wye Oak chose Iraq as the place where the Ministry should pay. J.A. 489–491 (Invoices). The Ministry in Iraq chose not to do so, and instead paid someone else in Iraq. Those withheld dollars—which should have changed hands in

Baghdad—were meant to fund Wye Oak's ongoing work in Iraq.

**B**

Wye Oak counters that, despite these extensive ties to Iraq, there still were three alleged "direct effects" in the United States: the missed payment, stymied business activities for the Pennsylvania-based Wye Oak operation, and diplomatic and military reactions to the contract breach. None qualifies as a direct effect in the United States within the meaning of the FSIA's commercial exception.

**1**

Wye Oak's first argument is that the missing funds from Iraq's refusal to pay are a direct effect in the United States. But Wye Oak has shown no such domestic harm because Wye Oak asked for the payment to be made in Iraq, not in the United States, and not to a United States bank.

Generally, if a foreign state is obligated to pay money due under a contract into a U.S. bank account—and does not—then those missing funds are considered a direct effect in the United States. *See Helmerich*, 784 F.3d at 818.

On the other hand, we have repeatedly held that when a foreign state merely has the discretion to pay in the United States, the missing funds do not have a direct effect in the United States. That is because, when the foreign state is not "supposed" to send money into the United States, its failure to pay the plaintiff has no "immediate consequence" there. *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 90–91 (D.C. Cir. 2005) (internal quotation marks omitted); *see Helmerich*, 784 F.3d at 818; *Goodman Holdings v. Rafidain*

*Bank*, 26 F.3d 1143, 1146 (D.C. Cir. 1994) (no direct effect when "[n]either New York nor any other United States location was designated as the place of performance where the money was supposed to have been paid") (quotation marks omitted); *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 39 (D.C. Cir. 2014) (There is "no direct effect where the foreign sovereign might well have paid its contract partner through a bank account in the United States but might just as well have done so outside the United States.") (quotation marks omitted).

At Wye Oak's direction, Iraq was obligated to pay Wye Oak in Baghdad, not the United States. *Wye Oak III*, 2022 WL 17820569, at \*7. Wye Oak submitted three invoices. Each one instructed the Ministry to pay Wye Oak "at [the Ministry's] Baghdad[,] Iraq office[.]" J.A. 489, 490, 491 (Invoices).

Wye Oak disputes this characterization of Iraq's obligation. A month after Iraq paid Zayna instead of Wye Oak, Dale emailed Zayna to tell him to pay Wye Oak via its Pennsylvania-based bank account. Wye Oak argues that this instruction changed Iraq's payment obligation to the United States.

But Iraq agreed to pay "pursuant to" the instructions in Wye Oak's invoices. J.A. 481 (Broker Services Agreement). Once it received those invoices, it was obligated to pay "immediately" and "in the form and manner" Wye Oak had instructed. J.A. 481 (Broker Services Agreement); J.A. 489 (Invoice) ("Pay Immediate Upon Receipt"); J.A. 490, 491 (Invoices) (same). Iraq never agreed to honor any changes to those instructions made weeks later by Wye Oak to a third party in an email. *See Wye Oak III*, 2022 WL 17820569, at \*7 ("[The Agreement] specified that Wye Oak would be paid pursuant to the pro forma invoices it submitted.").

Nor, in any event, does the email show that Iraq agreed to modify the process for receiving payment instructions. Even assuming Zayna could speak for the Ministry, *see Wye Oak III*, 2022 WL 17820569, at *2 n.2 (declining to resolve whether Zayna was Iraq's agent), Zayna responded to Dale's email by refusing to send the money to the United States, *id.* at *2. He instead told Dale that he had set up an *Iraqi* bank account for payment. J.A. 566 ("Come to Baghdad, I already opened an account for you in North bank a month ago and you already get paid a small amount, I'll feed t[h]is account as much[ ]as you need to proceed with this project."). So, to the extent Dale and Zayna's email exchange has any relevance, it corroborates that payment would be in Iraq.

Because Iraq, not the United States, was the place designated by Wye Oak "where the money was 'supposed' to have been paid[,]" Iraq's missed payments did not have a "direct effect" in the United States. *Goodman Holdings*, 26 F.3d at 1146; *see Peterson*, 416 F.3d at 90–91.

**2**

Wye Oak next argues that Iraq's breach interrupted the flow of commerce between the United States and Iraq. That argument fails as well because, for a breach of contract, a halt in commerce between the United States and another country counts as a direct effect in the United States only if the contract "establishe[d] or necessarily contemplate[d] the United States as a place of performance[.]" *Odhiambo*, 764 F.3d at 40.

Nothing in Wye Oak's Agreement with Iraq established or "necessarily contemplate[d]" performance in the United States. *Odhiambo*, 764 F.3d at 40. Quite the opposite. The contract was for the rehabilitation or scrapping of military equipment entirely in Iraq. The Agreement appointed Wye Oak as the

Ministry's "sole and exclusive Broker" for "the provision of Military Refurbishment Services with respect to all of the various military bases, offices and properties owned by, or under the control of, the Ministry and/or the Republic of Iraq[.]" J.A. 479 (Broker Services Agreement). There are no relevant domestic direct effects when "all activities covered by the contract would have occurred outside the United States[.]" *Cruise Connections Charter Mgmt. 1, LP v. AG of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010) (citing *United World Trade, Inc. v. Mangyshlakneft Oil Prods. Ass'n*, 33 F.3d 1232, 1237–1239 (10th Cir. 1994)).

True, the same Ministry official who signed the Agreement also gave Wye Oak a letter that represented that Wye Oak's work was to be undertaken "with the assistance and cooperation of the United States Mi[l]itary and all coalition partners as may[ ]be required by law, statute or as described in [the Agreement.]" J.A. 486 (Letter from Ministry to Wye Oak) (emphasis omitted). But that language does not appear in the Agreement. And nothing in the terms or subject of the Agreement itself shows that it necessarily contemplated performance in the United States. *See Odhiambo*, 764 F.3d at 40; *contrast EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, No. 22-7118, slip op. at 12 (D.C. Cir. June 11, 2024) (foreign fraud caused direct effect in United States because the plaintiffs' presence in the United States was the reason the foreign state targeted them, "not mere happenstance") (quotation marks omitted).

Anyhow, the letter must be read in the context of a military-rehabilitation service to be performed on Iraqi equipment in Iraq. *See* J.A. 1409 (Wye Oak's witness describing the letter as "a letter of introduction" that was meant to "ensure safe passage, or at least uninterrupted passage to [Iraqi] bases"). Given that setting for the contract's

performance, the letter's reference most logically refers to the support and assistance of the United States military and its coalition partners *in Iraq* by, for example, providing access to coalition-run facilities. *See Wye Oak I*, 2019 WL 4044046, at *8; J.A. 479–480 (Broker Services Agreement) (directing Wye Oak to begin work at multiple coalition-run facilities in Iraq). Iraq, after all, was a place of ongoing hostilities and military operations, making the support of the United States military in Iraq critical to Wye Oak's Iraqi operations.

Given all of that, Wye Oak's references to scattered commercial interchanges that dried up after Iraq's breach come up short. For example, David Stoffel decided to stop his work in West Virginia after months of not being paid. But Iraq never agreed to, or necessarily contemplated, his work in the United States in the first place. *See Odhiambo*, 764 F.3d at 40. The same goes for Wye Oak's planned American-based expansion: That was a unilateral business judgment made by Wye Oak that fell outside the scope of the Agreement. *See Cruise Connections*, 600 F.3d at 665.

As for any subcontracts Wye Oak planned to sign for work done abroad, their failure is not a direct effect in the United States for two reasons. First, they were not contemplated by the Agreement. Second, they were to be performed outside the United States. While some of the envisioned subcontractors were U.S. companies, "harm to a U.S. citizen, in and of itself, cannot satisfy the direct effect requirement." *Cruise Connections*, 600 F.3d at 665.

To be sure, one result of Iraq's breach is that Wye Oak eventually stopped operations in Iraq. Its U.S.-based personnel correspondingly stopped traveling to Iraq and no longer worked in the United States to support those Iraqi operations. But those "decision[s] to cease business" in the United States

did not "flow immediately" from Iraq's breach. *Helmerich*, 784 F.3d at 818–819. They were orthogonal to the disrupted Iraq-based work, especially since the Agreement simply never established or contemplated any travel or performance in the United States to begin with. *See Cruise Connections*, 600 F.3d at 665; *Odhiambo*, 764 F.3d at 40.

**3**

Lastly, Wye Oak argues that the breach had diplomatic and military impacts in the United States. That argument fares no better.

Wye Oak is correct that some American government officials took steps in the United States to assist Wye Oak. For example, at Wye Oak's urging, a Senator contacted the State Department to see if it could help get Wye Oak paid. *See Wye Oak III*, 2022 WL 17820569, at *15. The State Department then spoke with the Department of Defense. *Id.* The Department of Defense, in turn, met with Wye Oak and appointed a representative to advise the Iraqi Ministry on "acquisition logistics and basing" and to make weekly reports back to the Department on the Ministry's progress. *Id.*; J.A. 1315–1316, Trial Tr. 91:19–92:5; 94:21–95:18 (Dec. 19, 2018).

None of these diplomatic actions amounts to a direct effect of Iraq's breach. A direct effect cannot have any "intervening element" between it and the breach. *Princz*, 26 F.3d at 1172 (quotation marks omitted). These effects had at least three intervening and independent elements: Wye Oak's decision to seek out the officials; the officials' own decisions to act based on Wye Oak's overtures; and the government's response to those overtures. *See id.*; *Helmerich*, 784 F.3d at 818–819. The

Agreement did not contemplate any of those actions. *See Odhiambo*, 764 F.3d at 40.

Nor can we brush off those intervening elements as just additional, but-for causes for diplomatic actions that were inevitably triggered by Iraq's breach. *See EIG Energy*, slip op. at 13 (holding that the mere existence of "multiple but-for causes of an injury do[es] not break the chain of causation for any one of them") (quotation marks omitted). Iraq broke its promise to hand over the money in Baghdad. But then Dale chose to fly back to the United States and petition U.S. officials for support. Those officials independently opted to listen, and their subsequent actions were far from a necessary consequence of Iraq's failure to pay. *See Odhiambo*, 764 F.3d at 44 (Pillard, J., concurring in part) ("[I]n cases in which parties engage in commercial activities abroad and a plaintiff thereafter unilaterally decides to relocate to the United States where he then seeks to enforce claims relating to the foreign commercial activity, the direct-effects requirement is not satisfied.") (citing *Peterson*, 416 F.3d 83 and *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511 (D.C. Cir. 1988)).

Wye Oak next asserts that its mission's failure hurt U.S. readiness to withdraw from Iraq, which impacted how American decisionmakers in Washington approached winding down the conflict. That argument does not hold up either.

Wye Oak's work no doubt was an important piece of rebuilding Iraqi military capability. *Wye Oak III*, 2022 WL 17820569, at *17. And Iraq's rehabilitated military was important to U.S. strategy because the United States anticipated standing down its own troops as Iraq's stood up. *Id.*

But that is not enough. In *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), a Holocaust survivor

argued that his forced labor in German war factories had direct effects in the United States because he was contributing to the Nazi war effort, *id.* at 1168, 1172–1173. He reasoned that his work incrementally moved the needle in making the Nazis a more formidable foe. *See id.* at 1172. We rejected that argument, holding that too "[m]any events and actors necessarily intervened between" his work and "any effect felt in the United States" for it to constitute a direct effect. *Id.*

So too here. There were too many discretionary steps made by too many actors reacting to too many considerations and circumstances over multiple years to be able to trace the timing of the eventual withdrawal of American troops from Iraq directly (or even indirectly) to Iraq's failure to pay many years earlier on Wye Oak's contract. *See Weltover*, 504 U.S. at 618 (holding an effect was not direct because it was "too remote and attenuated"). Courts are particularly ill-equipped to sort through, in the first instance, causally intertwined matters involving complex and diplomatically sensitive pronouncements about strategic military decisionmaking in overseas hostilities. *See Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (Foreign-policy decisions "are delicate, complex, and involve large elements of prophecy"; the judiciary often lacks the "aptitude, facilities [and] responsibility" to evaluate them.); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("[It] is difficult to conceive of an area of governmental activity in which the courts have less competence" than "[t]he complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force[.]").

In sum, the record in this case does not show the type of direct effects in the United States from Iraq's breach of the Agreement that would trigger the FSIA's commercial exception.

**IV**

Because the FSIA's commercial exception does not apply in this case, Iraq is immune from suit. The district court accordingly lacked jurisdiction. We vacate its judgment and remand for dismissal of the case.

*So ordered.*