**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **MOHAMMAD HILMI NASSIF & PARTNERS**<br><br>     **Plaintiff,**<br><br>**v.**<br><br>**REPUBLIC OF IRAQ, et al.**<br><br>     **Defendants.** | **Civil Action No.**<br>**1:17-cv-02193 (KBJ/GMH)** |

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

In 1995, Defendant Republic of Iraq ("Iraq") owed Plaintiff Mohammad Hilmi Nassif & Partners, a Jordanian entity, money for an outstanding debt. To satisfy this debt, Iraq and co-Defendant Ministry of Industry and Minerals of the Republic of Iraq ("Ministry") agreed to ship 450,000 tons of sulfur and 100,000 tons of urea ("the product") to Plaintiff. Plaintiff would then sell the product to a U.S. buyer and retain the proceeds from the sale. Defendants, however, failed to ship the product, and Plaintiff won a judgment in Jordanian court against them for $53 million. Plaintiff now seeks to enforce that judgment in the United States under the District of Columbia's Uniform Foreign-Country Money Judgments Recognition Act of 2011 ("UFCMJRA"), D.C. Code § 15-361 *et seq.*

After Plaintiff filed the Complaint, Defendants defaulted and remained unresponsive for over eleven months. Faced with the threat of default judgment, Defendants appeared and filed a motion to set aside the Clerk's entry of default pursuant to Rule 55(c) of the Federal Rules of Civil

1

Procedure and a motion to dismiss the Complaint pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6).[1]

This case implicates two sensitive legal areas: federal courts' subject-matter jurisdiction and the United States' relations with foreign states. The Foreign Sovereign Immunities Act of 1976 ("FSIA," or "Act"), 28 U.S.C. § 1330 *et seq.*, establishes narrow jurisdictional requirements for a federal court to hear a case involving a foreign state. On a motion to dismiss for lack of subject-matter jurisdiction due to foreign sovereign immunity, however, the plaintiff bears only a burden of production to allege enough facts that, accepted as true and construing all reasonable inferences in the plaintiff's favor, demonstrate that the state has waived its immunity. Plaintiff has met this burden and stated an adequate claim for relief, and thus the undersigned recommends denying Defendants' motion to dismiss. The undersigned further recommends that Plaintiff be permitted to reattempt proper service, that Defendants' motion to set aside entry of default be granted, and that Plaintiff's amended motion for default judgment be denied as moot.

## I.    BACKGROUND

In October or November 1995,[2] Defendants agreed to ship 450,000 tons of sulfur and 100,000 tons of urea to Plaintiff, a Jordanian entity, to settle an outstanding debt that Iraq owed to

---

[1] Judge Ketanji Brown Jackson referred this case to the undersigned for full case management. The relevant docket entries considered by the undersigned for purposes of resolving these motions are (1) the Complaint (ECF No. 1) and its attachments, (2) the Clerk of the Court's certificate of mailing (ECF No. 9) and its attachments, (3) Plaintiff's returns of service/affidavits of summons and complaint executed (ECF Nos. 10, 11) and their attachments, (4) Plaintiff's amended motion for default judgment (ECF No. 24) and its attachments, (5) Defendants' motion to dismiss (ECF No. 28) and its attachments, (6) Plaintiff's opposition to the motion to dismiss (ECF No. 34), (7) Defendants' amended reply in further support of their motion to dismiss (ECF No. 37-1), (8) Defendants' motion to set aside entry of default (ECF No. 29) and its attachments, (9) Plaintiff's opposition to the motion to set aside entry of default (ECF No. 33), (10) Defendants' amended reply in further support of their motion to set aside entry of default (ECF No. 38-1), (11) Defendants' notice of supplemental authority (ECF No. 31), and (12) Plaintiff's response to the notice of supplemental authority (ECF No. 39). The page numbers cited herein are those assigned by the Court's CM/ECF system.

[2] In two of its affidavits, Plaintiff alleges that the contract was formed "[i]n or about October 1995." ECF No. 24-3 at 2–3, ¶ 5; ECF No 24-4 at 2–3, ¶ 5. The Complaint states that the contract was made in November 1995. ECF No. 1 ¶ 11. This inconsistency, however, is immaterial to this Report and Recommendation.

Plaintiff.[3]  ECF No. 1 ¶¶ 2, 10–11.  After receiving the product, Plaintiff would sell it to a U.S. buyer and retain the proceeds from the sale.  *Id.* ¶ 12.  The only written memorialization of the contract's terms is a letter ("Export Commitment Letter," or "Letter") dated November 22, 1995, signed by Yakoub Yousef Shonia, the then–Director General of the Ministry's Economic Department, and addressed to Plaintiff's tradename, "Trust Worldwide Trading Corporation."  ECF No. 24-3 at 7; ECF No. 1 ¶ 1.  The Letter states in relevant part: "[W]e have no objection to settle the entitlements by supplying you with 450000 (four hundred fifty thousand tons) of sulfur and 100000 (one hundred thousand tons) of urea as a repayment of the debt.  The said materials are to be exported via the Iraq-Jordan borders."  ECF No. 24-3 at 7.  Plaintiff has also submitted an affidavit from Mohammad Helmi Nassif ("Mohammad Nassif"), Plaintiff's current General Manager, regarding the contract's formation.  *Id.* at 2, ¶ 3.  Mohammad Nassif states that the agreement's terms were as follows: "Iraq would export 450,000 tons of sulfur and 100,000 tons of urea . . . , which would then be transited through the port of Aqaba, Jordan to a United States buyer, the purchase proceeds of which would belong to [Plaintiff] to satisfy the Commercial Debt . . . .  At the time, the United States was the only realistic market for the Product . . . ."  *Id.* at 2–3, ¶ 5.  Plaintiff has further submitted an affidavit from Abdel Naser Helmi Nassif ("Abdel Nassif"), Plaintiff's current Deputy General Manager and Commercial Manager at the time of contracting.  ECF No. 24-4 at 2, ¶ 3.  Abdel Nassif's description of the agreement's terms is identical to Mohammad Nassif's description.[4]  *Id.* at 2–3, ¶ 5.  According to Plaintiff, Defendants knew at the time of contracting

---

[3] The facts presented are based on Plaintiff's allegations, which Defendants have not disputed.  *See* ECF No. 28-1 at 9–10; ECF No. 29-1 at 5.

[4] Plaintiff alleges that Defendants affirmed the contract in 2006.  ECF No. 1 ¶ 11.  In support of this contention, Plaintiff cites a letter sent by the Ministry in 2006, in which the Ministry asked to meet with Plaintiff's representatives and for the representatives to bring "probative documents and papers that confirm receiving the materials that substitute payments to settle the due debt; as provided for in [the Export Commitment Letter] . . . ."  ECF No. 24-6 at 9.  This letter does not add any terms to the contract other than those set forth in the Export Commitment Letter and Plaintiff's affidavits.

that Plaintiff would ship the product to a U.S buyer and that the only way Plaintiff's debt would be satisfied was through such a sale. ECF No. 34 at 18–20. At this point in the litigation, Defendants do not dispute these allegations. *See* ECF No. 37-1 at 2–5.

Soon after entering into the agreement, Plaintiff claims it negotiated the sale of the expected sulfur and urea to a U.S. buyer. Specifically, in December 1995 or January 1996, Abdel Nassif contacted the U.S. Embassy in Jordan and informed it of the agreement in order to obtain a list of potential U.S. buyers. ECF No. 24-4 at 3, ¶¶ 7–9. The Embassy provided him a list of approximately fifteen potential buyers, from which he identified a New York company that offered Plaintiff the "best price" for the product. *Id.* at 3, ¶¶ 9–11. Plaintiff accepted the offer, and pursuant to its negotiations with the New York company, Abdel Nassif arranged for insurance, inspection services, letters of credit, and other requirements to prepare the product's shipment to the United States. *Id.* at 3–4, ¶¶ 11–15; *see* ECF No. 24-5 at 3–4, ¶¶ 7–15. By February 1996, Plaintiff was ready to ship the product to the New York company. ECF No. 24-4 at 4, ¶ 16. Defendants, however, failed to deliver either the sulfur or urea to Plaintiff. *Id.* at 4, ¶ 17; ECF No. 24-5 at 4, ¶ 16. As a result, at some point in or shortly after February 1996, the deal with the U.S. buyer collapsed. *See* ECF No. 24-4 at 4, ¶¶ 16–17; ECF No. 24-5 at 4, ¶¶ 16–18.

Faced with this breach of contract, starting around June 1997 and ending around late 2008 or early 2009, Plaintiff's representatives met in person with Iraqi government officials on several occasions to discuss both the agreement and Defendants' failure to deliver the promised product. ECF No. 24-3 at 3–4, ¶¶ 10–17; ECF No. 24-5 at 4–5, ¶¶ 19–26; ECF No. 24-6 at 3, ¶¶ 5, 7–8, 10–11. During those meetings, the officials reviewed the Export Commitment Letter and orally assured Plaintiff's representatives that the contract was valid and enforceable and that, should Defendants continue to fail to uphold their end of the bargain, Plaintiff could sue Defendants

anywhere, including the United States, and Defendants would not dispute the lawsuit.  *See* ECF No. 24-3 at 3, ¶ 14; ECF No. 24-5 at 5, ¶¶ 25–26; ECF No. 24-6 at 3, ¶¶ 7–8, 11.  Despite these oral assurances, Defendants never shipped the product.  ECF No. 1 ¶ 13.

In November 2010, Plaintiff sued Defendants in Jordanian court for breaching the contract. *Id.* ¶ 14.  Defendants do not dispute that they participated in that proceeding without invoking sovereign immunity.  *See* ECF No. 28-1 at 23–24.  In fact, in late 2011 or early 2012, the then-head of the Ministry told one of Plaintiff's representatives that "Iraq would not release any money unless [Plaintiff] ha[d] a court order" from the "Middle East, Europe, or the United States," and that "Iraq would not and could not dispute the lawsuit at all."  ECF No. 24-6 at 3–4, ¶¶ 13, 14–15. In September 2015, the Jordanian court found Defendants jointly and severally liable for breaching the agreement to ship the product and awarded Plaintiff $53 million in damages.  ECF No. 1 ¶ 16; *see* ECF No. 1-2 at 3–16.  To date, however, neither Defendant has paid any portion of the judgment.  ECF No. 1 ¶¶ 17–19; ECF No. 34 at 8; ECF No. 1-1 at 5.

On October 23, 2017, Plaintiff sued Defendants in the U.S. District Court for the District of Columbia to enforce the Jordanian judgment under the UFCMJRA.  *See generally* ECF No. 1. Defendants missed their deadlines for responding to the Complaint.  ECF No. 33 at 7.  Thus, the Clerk of the Court entered default against them.  ECF No. 15.  Over eleven months later, and after Plaintiff filed an amended motion for default judgment (ECF No. 24), Defendants appeared and filed a motion to dismiss the Complaint (ECF No. 28) and a motion to set aside entry of default (ECF No. 29).  Those motions are presently ripe for adjudication.

In their motion to dismiss, Defendants allege lack of subject-matter jurisdiction on foreign sovereign immunity grounds.  ECF No. 28-1 at 10–30.  They also seek dismissal for insufficient service of process and failure to state a claim upon which relief can be granted.  *Id.* at 30–35.  In

5

their motion to set aside entry of default, Defendants argue that good cause exists for a set-aside because their defaults were not willful, a set-aside would not prejudice Plaintiff, their defenses are meritorious, and as foreign states, they are entitled to a presumption that the default entered against them should be set aside. ECF No. 29-1 at 6–15. Plaintiff disputes all these contentions. *See generally* ECF Nos. 33, 34.

## II.   MOTION TO DISMISS

This Court must first decide whether it has subject-matter jurisdiction over this case. *See Lemma v. Hispanic Nat'l Bar Ass'n*, 318 F. Supp. 3d 21, 23 (D.D.C. 2018) ("[F]ederal courts 'generally may not rule on the merits of a case without first determining that [they] have . . . subject matter jurisdiction' . . . ." (second and third alterations in original) (quoting *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)); *Smith v. World Bank Grp.*, 99 F. Supp. 3d 166, 169 (D.D.C. 2015) ("Where a defendant is immune from suit, [ ] 'the Clerk's subsequent entry of a default . . . [is] void from the outset for lack of jurisdiction.'" (second and third alterations in original) (quoting *Garcia v. Sebelius*, 919 F. Supp. 2d 43, 46 (D.D.C. 2013))). Accordingly, the undersigned will address Defendants' motion to dismiss before considering their motion to set aside entry of default.

This Court should deny Defendants' motion to dismiss. Plaintiff has provided sufficient evidence at this stage that Defendants explicitly waived their sovereign immunity and that this Court therefore has subject-matter jurisdiction. Furthermore, this Court should reject Defendants' arguments to dismiss for insufficient service of process and failure to state a claim upon which relief can be granted and permit Plaintiff to reattempt proper service.

### A. Legal Standards

1. Rule 12(b)(1)

To survive a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction on grounds of FSIA immunity, the plaintiff must present "adequate supporting evidence" that the court has jurisdiction. *SACE S.p.A. v. Rep. of Paraguay*, 243 F. Supp. 3d 21, 33 (D.D.C. 2017). However, "this is only a burden of production; the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of a factual basis by a preponderance of the evidence." *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008); *see Princz v. Fed. Rep. of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994) ("It is the burden of the foreign sovereign in each case to establish its immunity by demonstrating that none of the [FSIA] exceptions is applicable."); *de Csepel v. Rep. of Hungary*, 808 F. Supp. 2d 113, 127 (D.D.C. 2011) ("[T]he plaintiff bears the burden of asserting at least some facts showing that one of the FSIA exceptions applies. The burden then shifts back to the defendant to prove, by a preponderance of the evidence, that the alleged exception does not apply." (internal citations omitted)), *rev'd in part on other grounds*, 714 F.3d 591 (D.C. Cir. 2013).

More generally, on a Rule 12(b)(1) motion, a court must accept as true the factual allegations in the complaint and construe all reasonable inferences in the light most favorable to the plaintiff. *Cause of Action Inst. v. IRS*, 390 F. Supp. 3d 84, 91 (D.D.C. 2019). A court need not, however, "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 7 (D.D.C. 2019) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001)). Because a court's subject-matter jurisdiction is crucial, "the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to

Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). Thus, on a Rule 12(b)(1) motion, a court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." *N. Am. Butterfly Ass'n v. Nielsen*, 368 F. Supp. 3d 1, 6 (D.D.C. 2019) (quoting *Bank of Am., N.A. v. FDIC*, 908 F. Supp. 2d 60, 76 (D.D.C. 2012)).

2.      Rule 12(b)(5)

On a Rule 12(b)(5) motion to dismiss for insufficient service of process, the plaintiff bears the burden of showing that service of process was proper. *See Hilska v. Jones*, 217 F.R.D. 16, 20 (D.D.C. 2003) (citing *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987)). Thus, the plaintiff "must demonstrate that the procedure employed satisfied the requirements of the relevant portions of Rule 4 [which governs summonses] and any other applicable provision of law." *Jouanny v. Embassy of France in the U.S.*, 220 F. Supp. 3d 34, 37–38 (D.D.C. 2016) (alteration in original) (quoting *Light*, 816 F.2d at 751). "[U]nless the procedural requirements for effective service of process are satisfied, a court lacks authority to exercise personal jurisdiction over the defendant." *Law Offices of Arman Dabiri & Assocs. P.L.L.C. v. Agric. Bank of Sudan*, No. 17-2497 (RDM), 2019 WL 231753, at *3 (D.D.C. Jan. 16, 2019) (alteration in original) (quoting *Candido v. District of Columbia*, 242 F.R.D. 151, 160 (D.D.C. 2007)). A court may therefore dismiss a case for improper service. *See Tom Sawyer Prods., Inc. v. Progressive Partners Achieving Solutions, Inc.*, 550 F. Supp. 2d 23, 26 (D.D.C. 2008). A court may, however, "'in its sound discretion,' also 'direct that service be effected within a particular period of time.'" *Arman Dabiri*, 2019 WL 231753, at *3 (quoting *Wilson v. Prudential Fin.*, 332 F. Supp. 2d 83, 89 (D.D.C. 2004)).

### 3.     Rule 12(b)(6)

To withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although a court must assume the veracity of the complaint's factual allegations and construe them in the light most favorable to the plaintiff, a court need not accept conclusory assertions or legal conclusions.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Notably, "a Rule 12(b)(6) motion does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim." *Coulibaly v. Kerry*, 213 F. Supp. 3d 93, 123 (D.D.C. 2016).  Accordingly, a plaintiff is "not re-quired to anticipatorily negate" an affirmative defense in its complaint.  *McNamara v. Picken*, 866 F. Supp. 2d 10, 17 (D.D.C. 2012); *see Chem-Met Co. v. Metaland Int'l, Inc.*, No. Civ. A. 96-2548(TAF), 1997 WL 74541, at *2 (D.D.C. Feb. 19, 1997) (noting that the Federal Rules of Civil Procedure "only require a plaintiff to set forth a short, plain statement of its claims; they do not require a plaintiff to anticipate affirmative defenses which might be raised by a defendant").

### B.     Discussion

### 1.     Rule 12(b)(1)

The FSIA affords "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Under the FSIA, a foreign state[5] "is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim

---

[5] The FSIA defines the term "foreign state" for purposes of the Act.  *See* 28 U.S.C. § 1603.  Plaintiff, however, does not dispute that the FSIA applies to both Defendants.  *See* ECF No. 1 ¶¶ 3–4; ECF No. 33 at 7–8; ECF No. 34 at 7–8.  Thus, this Court need not address this issue.

against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Two potential exceptions to sovereign immunity are at issue here: explicit waiver[6] under 28 U.S.C. § 1605(a)(1), and the third clause of the commercial activities exception under 28 U.S.C. § 1605(a)(2).  Each exception will be addressed in turn below.

The undersigned finds that Plaintiff has met its burden of production to show that Defendants explicitly waived their sovereign immunity and further finds that Defendants have failed to rebut this showing by a preponderance of the evidence.  This Court may end its inquiry there and deny Defendants' motion to dismiss for lack of subject-matter jurisdiction.  However, the undersigned will also address the parties' arguments regarding the commercial activities exception and make alternative recommendations based on that analysis.

a.       Explicit Waiver of Sovereign Immunity

"In general, explicit waivers of sovereign immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the language requires.'" *World Wide Minerals, Ltd. v. Rep. of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986)).  Thus, a foreign state "will not be found to have [explicitly] waived its immunity unless it has clearly and unambiguously done so." *World Wide Minerals*, 296 F.3d at 1162 (citing *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292 (11th Cir. 1999) (stating that an explicit waiver "must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity")).

As a preliminary matter, Defendants argue that explicit waivers must both be in writing and be in the parties' commercial contract to be enforceable.  *See* ECF No. 28-1 at 21–22, 27–28.

---

[6] A foreign state may also implicitly waive its immunity.  28 U.S.C. § 1605(a)(1).  Plaintiff, however, argues only that Defendants have explicitly waived their immunity and asserts that implicit waiver is irrelevant to this case.  *See* ECF No. 34 at 9–16; ECF No. 33 at 23.  Thus, this Court need not address this issue.

The FSIA's plain text, however, contains no such requirements. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)). "[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (second alteration in original) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). Thus, courts "will not read into [a] statute a mandatory provision that Congress declined to supply." *Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018, 1023 (D.C. Cir. 2014); *see Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 412 (2011) ("In interpreting a statute, '[o]ur inquiry must cease if the statutory language is unambiguous' . . . and 'the statutory scheme is coherent and consistent.'" (first alteration in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997))). Section 1605(a)(1) states only that a foreign state may "explicitly" waive its immunity. 28 U.S.C. § 1605(a)(1). "Explicitly" means "[i]n a definite and unambiguous manner; unequivocally; expressly; clearly, plainly," which connotes only clarity of expression, whether verbal or nonverbal. *Explicitly*, Oxford English Dictionary (*OED Third Edition* 2016). Although the absence of a written waiver of sovereign immunity may present proof problems for a plaintiff, section 1605(a)(1) does not impose a requirement of such a writing.

Defendants point to language in the FSIA's legislative history to argue that explicit waivers must be in writing. *See* EFC No. 28-1 at 27 n.6 (citing H.R. Rep. 94-1487 at 6617). The passage that Defendants cite states that, "[w]ith respect to explicit waivers, a foreign state may renounce its immunity . . . in a contract with a private party." H.R. Rep. 94-1487 at 6617. But that passage

11

was merely providing one example of explicit waiver, and there is nothing in it implying that such a "contract" must be in writing. *See id.* Thus, the legislative history of section 1605(a)(1) is not inconsistent with oral waiver. Defendants also point to a case in this District in which the court noted that a foreign state explicitly waives its immunity when it "expressly consents—for example, in the text of a treaty or a contract—to forgo its immunities with regard to a certain class of disputes or a particular subject-matter." ECF No. 28-1 at 27 (quoting *Ashraf-Hassan v. Embassy of France*, 40 F. Supp. 3d 94, 99 (D.D.C. 2014)). As in the FSIA's legislative history, the court in that case was merely offering a non-exhaustive list of the ways a foreign state may explicitly waive its immunity. *See Ashraf-Hassan*, 40 F. Supp. 3d at 100 (stating further that "[a]lthough, in this case, there is no such express provision in either a treaty or contract, Defendant may have expressly waived its immunity in its initial pleading").

More, section 1605(a)(1) contains no language requiring or even implying that explicit waiver must be in the parties' commercial contract. *See* 28 U.S.C. § 1605(a)(1). In fact, courts have found that a foreign state may explicitly waive its immunity after a lawsuit arising from a commercial contract commences. *See, e.g.*, *Aquamar*, 179 F.3d at 1283, 1292–1300 (holding that a foreign state explicitly waived its immunity where one of its ambassadors wrote a letter purporting to do so after the complaint was filed); *see also Ashraf-Hassan*, 40 F. Supp. 3d at 100 (noting that the foreign state in that case "may have expressly waived its immunity in its initial pleading"). Hence, a foreign state could, consistent with section 1605(a)(1), orally waive its immunity after entering into a commercial contract, provided that such a waiver is explicit.

Turning to the substantive standard for explicit waiver, courts have held that a foreign state explicitly waives its sovereign immunity when it invokes precise language doing so. For example, in *World Wide Minerals*, the D.C. Circuit held that a foreign state explicitly waived its immunity

12

for some types of claims because it stated that it "irrevocably agrees not to claim and hereby irrev-ocably waives . . . immunity for itself . . . with the intent . . . that the foregoing waiver of immunity shall have irrevocable effect for the purposes of the [FSIA] in any legal action or proceedings to which such Act applies." 296 F.3d at 1162 & n.13 (first alteration in original) (quoting the parties' agreement). Similarly, in *Capital Ventures Int'l v. Rep. of Argentina*, the Second Circuit deter-mined that a foreign state explicitly waived its immunity when it asserted that, "[t]o the extent that the [state] has or hereafter may acquire any immunity (sovereign or otherwise) from [the] jurisdic-tion of any court or from any legal process . . . , the [state] hereby irrevocably waives such immun-ity in respect of its obligations." 552 F.3d 289, 293–94 (2d Cir. 2009) (first and fourth alterations in original) (quoting the defendant's offering circular for the bonds at issue). The court also held that "[t]here can be explicit waivers without reference to the United States, as the waiver of im-munity in 'any court' . . . illustrates." *Id.* at 295; *see also World Wide Minerals*, 296 F.3d at 1162 & n.13 (finding explicit waiver despite the absence of any mention of the United States). And in *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, the Second Circuit held that, where a foreign state claimed that one of its entities "can sue and be sued in its own name and does not have any right of immunity from suit with respect to the [entity's] obligations" and that it "irrevo-cably and unconditionally waives any right or immunity from legal proceedings including suit judgment and execution on grounds of sovereignty which it or its property may now or hereafter enjoy," the entity had explicitly waived its immunity. 676 F.2d 47, 49–50 (2d Cir. 1982) (quoting the parties' agreement).

By contrast, courts have found that a foreign state retains its sovereign immunity when it fails to invoke any language regarding waiver of immunity. For example, in *World Wide Minerals*, the D.C. Circuit held that there was insufficient evidence of explicit waiver in two of the parties'

agreements due to the absence of any language indicating waiver, which "create[d] real ambiguity" regarding the foreign state's intent as to those agreements. 296 F.3d at 1162–63. Similarly, in *de Sousa v. Embassy of Rep. of Angola*, this Court determined that the foreign state failed to waive its immunity explicitly because the plaintiff's evidence of waiver consisted only of an American choice-of-law provision that was silent on the issue of waiver and in which "the word[ ] 'immunity' . . . [did] not appear . . . at all." 229 F. Supp. 3d 23, 31 (D.D.C. 2017). And in *Moore v. Nat'l Distillers and Chem. Corp.*, the district court concluded that there was no explicit waiver because the agreement in question made "no reference, explicit or otherwise, to waiver [or] sovereign immunity." 143 F.R.D. 526, 536 (S.D.N.Y. 1992).

Here, Plaintiff has met its burden of production at this early stage of the litigation to show explicit waiver, and Defendants have failed to "establish the absence of a factual basis [of waiver] by a preponderance of the evidence." *Agudas Chasidei*, 528 F.3d at 940. In support of waiver, Plaintiff points to the following statements made by Defendants' representatives:[7]

> The Minister of Industry and Minerals, Adnan Al-Ani, . . . said that Plaintiff had the right to sue Iraq on the [Export Commitment] Letter, that it had the right to sue Iraq anywhere on this obligation and that Iraq would not object to being sued anywhere. In fact, the Minister expressly informed [Plaintiff] that, if [it] was to sue, [it] should not sue in Iraq, should stay out of the Arab states and should sue elsewhere.

ECF No. 24-3 at 3, ¶¶ 10, 14.

> The President [of Iraq, Ahmed Chalabi,] read the Letter and confirmed that it was indeed an unconditional undertaking and that it was a valid commercial obligation of the Republic of Iraq. . . . He agreed that it was [Plaintiff's] right to sue and that there was no limitation in the Letter requiring [Plaintiff] to sue in Iraq. In fact, he stated that the Letter was a valid, unconditional obligation and that it could be enforced against Iraq anywhere . . . .

ECF No. 24-5 at 5, ¶¶ 19, 25–26.

---

[7] Defendants do not dispute at this point that the declarants in Plaintiff's affidavits made these statements or that they had authority to waive Defendants' sovereign immunity. *See* ECF No. 37-1 at 6–7.

> Yakoub Yousef Shonia [the Director General of the Ministry's Economic Department,] . . . reviewed the Letter, recalled well his signing of the same and stated that . . . [Plaintiff] had the right to sue Iraq anywhere to enforce its rights under the Letter, whether in the Middle East, Europe or the United States. . . . [I]n fact, Mr. Shonia stated that Iraq and the Ministry would have no defense to any such lawsuit by [Plaintiff].

ECF No. 24-6 at 3, ¶¶ 5, 7–8.

> [T]he Minister of Industry and Minerals of the Republic of Iraq, Fawzi Franco Hariri, . . . told [Plaintiff's representative] that, in order to collect [on the debt], [Plaintiff] would have to bring a lawsuit.  He also said that [Plaintiff] may sue Iraq and the Ministry anywhere it wants—including in the Middle East, Europe or the United States . . . .

*Id.* at 3, ¶¶ 10–11.

> [T]he subsequent Minister of Industry and Minerals of the Republic of Iraq, Ahmad Al Karbouli, . . . [stated] that [Plaintiff] may sue Iraq and the Ministry anywhere it would like, [and] that Iraq would not and could not dispute the lawsuit at all . . . .  Mr. Karbouli actually explained . . . [that Plaintiff] should sue Iraq and the Ministry in any country, [and] that Iraq and the Ministry would not and could not dispute the suit . . . .

*Id.* at 3–4, ¶¶ 13–15.

Accepting the veracity of these allegations and construing all reasonable inferences in the light most favorable to Plaintiff—as is required of this Court on a motion to dismiss—Plaintiff has provided "adequate supporting evidence" of explicit waiver.  *SACE S.p.A.*, 243 F. Supp. 3d at 33.  The statements above unambiguously permit Plaintiff to sue Defendants in the United States to enforce the contract.  ECF No. 24-6 at 3, ¶ 7 ("[Plaintiff] ha[s] the right to sue Iraq anywhere to enforce its rights under the [Export Commitment] Letter, whether in the Middle East, Europe or the United States."); *id.* at 3, ¶ 11 ("[Plaintiff] may sue Iraq and the Ministry anywhere it wants—including in the . . . United States . . . ."); *see* ECF No. 24-3 at 3, ¶ 14 ("Plaintiff ha[s] the right to sue Iraq on the Letter, [ ] it ha[s] the right to sue Iraq anywhere on this obligation[,] and [ ] Iraq would not object to being sued anywhere."); ECF No. 24-5 at 5, ¶ 26 ("[T]here [is] no limitation in the Letter requiring [Plaintiff] to sue in Iraq.  In fact, . . . the Letter [is] a valid, unconditional

obligation and [ ] it could be enforced against Iraq anywhere . . . ..”); ECF No. 24-6 at 4, ¶ 15 ("[Plaintiff] should sue Iraq and the Ministry in any country . . . .”); *cf. Capital Ventures*, 552 F.3d at 295 ("There can be explicit waivers without reference to the United States, as the waiver of immunity in 'any court' . . . illustrates.”). More, they unequivocally waive any defense to such a lawsuit. *See, e.g.*, ECF No. 24-6 at 3, ¶ 8 ("Iraq and the Ministry would have no defense to any such lawsuit by [Plaintiff].”); *id.* at 4, ¶ 14 ("Iraq would not and could not dispute the lawsuit at all . . . .”). Together, this evidence is sufficient to meet Plaintiff's burden of production as to explicit waiver.

The burden then shifts to Defendants to demonstrate by a preponderance of the evidence that they have not explicitly waived their sovereign immunity. *Agudas Chasidei*, 528 F.3d at 940. Defendants offer no evidence at this point to rebut Plaintiff's showing. Rather, they argue that the above statements attributed to Iraqi officials are ambiguous because none of the officials stated that they were "*waiving the foreign sovereign immunity of Iraq.*" ECF No. 37-1 at 6 (emphasis in original). But the FSIA does not require magic words like "waiver" or "immunity" to effect explicit waiver; it requires only that such a waiver be made "[i]n a definite and unambiguous manner; unequivocally; expressly; clearly, plainly." *Explicitly*, Oxford English Dictionary (*OED Third Edition* 2016); *see* 28 U.S.C. § 1605(a)(1). Plaintiff's evidence is sufficient to satisfy this standard, at least at this stage in the proceedings. This is not a case where a foreign state has remained silent on the issue of waiver. *See World Wide Minerals*, 296 F.3d at 1162–63; *de Sousa*, 229 F. Supp. 3d at 31; *Moore*, 143 F.R.D. at 536. Instead, Plaintiff alleges that Defendants, through their representatives, have repeatedly employed clear language permitting Plaintiff to sue Defendants in the United States and expressly waiving *any defense* to such a lawsuit. *Cf. World Wide Minerals*, 296 F.3d at 1162 & n.13; *Capital Ventures*, 552 F.3d at 293–94; *Libra Bank*, 676 F.2d at 49–50.

16

These statements, accepted as true and construing all reasonable inferences in the light most favorable to Plaintiff, constitute a "clear[ ] and unambiguous[ ]" waiver of the defense of sovereign immunity. *World Wide Minerals*, 296 F.3d at 1162. Accordingly, this Court should deny Defendants' Rule 12(b)(1) motion.[8]

b.     Commercial Activities Exception

In the event this Court finds that Defendants have not explicitly waived their sovereign immunity, the undersigned will address the parties' arguments regarding the FSIA's commercial activities exception. Under that exception, even if a foreign state has not waived its immunity, a district court has subject-matter jurisdiction over any lawsuit

> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Only the third clause of this exception—when the lawsuit is "based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States," *id.*—is at issue here. ECF No. 34 at 16.

Defendants do not dispute that Plaintiff's lawsuit is "based upon" an act that occurred outside the United States. ECF No. 28-1 at 15–16. They argue, however, that because Plaintiff's lawsuit is "based upon" only the Jordanian judgment, which was not an act made in connection with either Defendant's commercial activities, section 1605(a)(2) is inapplicable. *Id.* at 20.

---

[8] Defendants, however, should be permitted to raise the issue of explicit waiver again in future pretrial proceedings when the record is more developed because, when faced with a foreign state's invocation of immunity, "more than the usual is required of trial courts in making pretrial factual and legal determinations. In such circumstances, it is particularly important that the court 'satisfy itself of its authority to hear the case *before* trial.'" *Foremost-McKesson, Inc. v. Islamic Rep. of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (internal citation omitted) (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984)).

17

Plaintiff does not dispute that the Jordanian judgment was not an act for which section 1605(a)(2) applies. *See* ECF No. 34 at 16–26. Instead, Plaintiff contends that its lawsuit is "based upon" Defendants' failure to ship the product under the agreement, which constitutes a commercial act for purposes of section 1605(a)(2). *See id.* Resolving this issue thus requires deciding whether, under the third clause of section 1605(a)(2), a lawsuit to enforce a foreign judgment is "based upon" only the judgment or also upon a foreign state's commercial conduct from which the judgment arises.

The Supreme Court has stated that, for purposes of the first clause of the commercial activities exception, which is not at issue here, a lawsuit is "'based upon' . . . those elements of a claim that, if proven, would entitle a plaintiff to relief under [its] theory of the case." *Nelson*, 507 U.S. at 357; *see also OBB Personenverkehr AG v. Sachs*, __ U.S. __, __, 136 S. Ct. 390, 396 (2015) (affirming *Nelson*'s definition of "based upon" for purposes of the first clause). The D.C. Circuit has extended *Nelson* to the second clause of section 1605(a)(2), which is also not at issue here, noting that the "virtually identical statutory text and structure of clauses one and two lead us to conclude that 'based upon' means the same thing in both clauses." *Odhiambo v. Rep. of Kenya*, 764 F.3d 31, 37 (D.C. Cir. 2014). Thus, the court held that "a suit against a foreign sovereign may proceed under clause two only if the 'act performed in the United States in connection with a commercial activity of the foreign state elsewhere' establishes a fact without which the plaintiff will lose." *Id.* at 38 (quoting 28 U.S.C. § 1605(a)(2)) (citing *Nelson*, 507 U.S. at 357). For the third clause, however, neither the Supreme Court nor the D.C. Circuit has articulated a definition of "based upon."

Perhaps as a result of this gap, courts are split on whether, for purposes of the third clause, an action to enforce a foreign judgment is "based upon" only the judgment or also upon a foreign

state's commercial conduct from which the judgment arises.  On the one hand, the Second Circuit, relying on a previous panel's case predating *Nelson*, has held that courts should "look at the conduct underlying the . . . judgment[ ]."  *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 389 (2d Cir. 2000) (citing *Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11–12 (2d Cir. 1989)).  On the other hand, this Court recently extended *Nelson* to the third clause of section 1605(a)(2) and held that such an action is "based upon" only the judgment, not a foreign state's commercial conduct giving rise to the judgment.  *Valambhia v. United Rep. of Tanzania*, No. 18-cv-370 (TSC), 2019 WL 1440198, at *3–4 (D.D.C. Mar. 31, 2019), *appeal docketed*, No. 19-7040 (D.C. Cir. May 7, 2019).  The *Valambhia* Court reasoned that the elements of a foreign-judgment recognition claim are as follows: (1) the foreign court had personal and subject-matter jurisdiction over the action; (2) the foreign court had due process safeguards; and (3) the foreign court issued an enforceable final judgment.  *Id.* at *3 (citing D.C. Code §§ 15-363(a), 15-364(b)).  Thus, the court held that, because the "underlying commercial conduct . . . is not an 'element[ ] of a claim' for recognition of a foreign judgment or 'a fact without which the plaintiff will lose,'" the commercial activities exception is inapplicable to such a claim.  *Valambhia*, 2019 WL 1440198, at *3–4 (second alteration in original) (first quoting *Nelson*, 507 U.S. at 357, then quoting *Odhiambo*, 764 F.3d at 38).  The court acknowledged that its holding "effectively makes dead letter of an action to recognize a foreign court judgment brought against a foreign sovereign under the commercial activities exception" because a court judgment would never be deemed an act taken in connection with commercial activity under the third clause of section 1605(a)(2), but it maintained that "a faithful interpretation of *Odhiambo* and *Nelson*" necessitated this outcome.  *Valambhia*, 2019 WL 1440198, at *4.  The court also noted that, in *Transatlantic Shiffahrtskontor*, the Second Circuit called into question its approach as being "in some tension with a literal reading

19

of the definition of 'based upon' used by the Supreme Court in *Nelson*." *Valambhia*, 2019 WL 1440198, at *4 (quoting *Transatlantic Shiffahrtskontor*, 204 F.3d at 389 n.4).

*Valambhia*'s reasoning is persuasive, and this Court should find that, for purposes of all three clauses of the commercial activities exception, an action to enforce a foreign judgment is "based upon" only the judgment, not a foreign state's commercial conduct giving rise to the judgment. Importantly, all three clauses of this exception have "virtually identical statutory text and structure." *Odhiambo*, 764 F.3d at 37; *see* 28 U.S.C. § 1605(a)(2). And "there is a presumption that a given term is used to mean the same thing throughout a statute, a presumption surely at its most vigorous when a term is repeated within a given sentence." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). Thus, *Nelson* should be deemed to apply to the third clause of section 1605(a)(2). The Supreme Court in that case clarified that a lawsuit is "'based upon' . . . those elements of a claim that, if proven, would entitle a plaintiff to relief under [its] theory of the case." *Nelson*, 507 U.S. at 357. Because the elements of a foreign-judgment recognition claim relate only to the judgment and not a foreign state's commercial conduct, such a lawsuit, for purposes of the commercial activities exception, is "based upon" only the judgment. *See* D.C. Code §§ 15-363(a), 15-364(b); *cf. Valambhia*, 2019 WL 1440198, at *3–4. Thus, the commercial activities exception is inapplicable here, as Plaintiff does not dispute that the Jordanian judgment was not made in connection with either Defendant's commercial activities. *See* ECF No. 34 at 16–26; *see also Valambhia*, 2019 WL 1440198, at *4 (noting that its holding "effectively makes dead letter of an action to recognize a foreign court judgment brought against a foreign sovereign under the commercial activities exception").

Alternatively, if this Court were to find that application of the commercial activities exception requires inquiring into Defendants' commercial conduct giving rise to the Jordanian judgment,

there would be an "act taken in connection with [Defendants'] commercial activity"—namely, Defendants' failure to ship the product.[9]  28 U.S.C. § 1605(a)(2).  This Court would then have to determine whether Defendants' actions had a "direct effect" in the United States.  28 U.S.C. § 1605(a)(2).  For reasons explained below, Plaintiff's allegations sufficiently establish a direct effect such that the commercial activities exception would apply.

The D.C. Circuit's cases "draw a very clear line: For purposes of clause three of the FSIA commercial activity exception, breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States." *Odhiambo*, 764 F.3d at 40. Accordingly, courts have found direct effect where the parties knew at the time of contracting that at least some contractual performance would occur in the United States.  For example, in *de Csepel*, the D.C. Circuit held that, where the plaintiffs alleged that the defendant breached a promise to return artwork to a family it knew to be residing in the United States at the time of contracting, the plaintiffs had provided sufficient evidence of direct effect to survive a motion to dismiss.  714 F.3d at 600–01.  Similarly, in *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, the D.C. Circuit determined that the plaintiff had alleged enough facts to withstand a motion to dismiss where the agreement in question obligated the plaintiff to subcontract with U.S.-based companies, and the defendant breached the agreement while the plaintiff was negotiating with those companies.  600 F.3d 661, 662, 663–66 (D.C. Cir. 2010).  The court further held that "[n]othing in the FSIA requires that the 'direct effect in the United States' harm the plaintiff." *Id.* at 666.

---

[9] Defendants do not presently dispute that their failure to ship the product is an act for which section 1605(a)(2) applies, but they argue that it had no direct effect. *See* ECF No. 28-1 at 15–20.

By contrast, the D.C. Circuit and this Court have found no direct effect where at least one of the parties was not aware at the time of contracting that any contractual performance would occur in the United States. For example, in *Odhiambo*, the D.C. Circuit found no direct effect where a foreign state failed to pay the plaintiff a promised reward in the United States because the plaintiff moved to the United States after accepting the offer, which was not contemplated at the time of acceptance. 764 F.3d at 33, 40–41. Similarly, in *Agrocomplect, AD v. Rep. of Iraq*, this Court held that there was no direct effect because "[t]he decision to use American sub-contractors and American supplies was the plaintiff's decision, and the plaintiff [did] not allege that its decision was mandated by the Contract or expected based on the customary practices of the parties." 524 F. Supp. 2d 16, 32 (D.D.C. 2007).

Here, Plaintiff has alleged sufficient facts showing that the parties contemplated performance in the United States when they entered into the agreement. According to Plaintiff, under the agreement, Defendants would settle their debt by shipping the product so that Plaintiff could sell it to a U.S. buyer. *See* ECF No. 24-3 at 2–3, ¶ 5 ("Iraq would export 450,000 tons of sulfur and 100,000 tons of urea . . . , which would then be transited through the port of Aqaba, Jordan to a United States buyer, the purchase proceeds of which would belong to [Plaintiff] to satisfy the Commercial Debt . . . ."); ECF No. 24-4 at 2–3, ¶ 5 (same). Plaintiff's alleged actions shortly after entering into the agreement corroborate its claim that the sale to a U.S. buyer was an essential component of the settlement: Abdel Nassif contacted the U.S. Embassy in Jordan and informed it of the agreement in order to obtain a list of potential U.S. buyers, and after the Embassy provided him such a list, he identified a New York company that offered the "best price" for the product. ECF No. 24-4 at 3, ¶¶ 7–11. Pursuant to its negotiations with that company, Plaintiff, through Abdel Nassif, arranged for insurance, inspection services, letters of credit, and other requirements

to prepare the product's shipment to the United States. *Id.* at 3–4, ¶¶ 11–15; *see* ECF No. 24-5 at 3–4, ¶¶ 7–15. When Defendants failed to ship the product, Plaintiff's deal with the New York company collapsed. ECF No. 24-4 at 4, ¶¶ 16–17; ECF No. 24-5 at 4, ¶¶ 16–18. Moreover, Plaintiff claims that Defendants knew at the time of contracting that Plaintiff would ship the product to a U.S buyer and that the only way Plaintiff's debt would be satisfied was through such a sale in the United States. ECF No. 34 at 19–20. These allegations, accepted as true and construing all reasonable inferences in the light most favorable to Plaintiff, establish that, because Defendants "terminated the contract," performance that was contemplated in the United States and that otherwise would have been rendered there "was not forthcoming," and thus Defendants' commercial activities had a direct effect in the United States. *Cruise Connections*, 600 F.3d at 665.

The burden then shifts to Defendants to show by a preponderance of the evidence that the agreement did not contemplate performance in the United States. *Agudas Chasidei*, 528 F.3d at 940. They argue that their "role was to deliver the [product] to Jordan, not to export [it] to the United States," which was "an activity to be performed exclusively by [ ] Plaintiff," and that they "could not have 'failed' to do something they never sought to do nor had any obligation to do." ECF No. 37-1 at 4. In support of this claim, Defendants cite the Export Commitment Letter, which provides only that Defendants would export the product "*via the Iraq-Jordan borders*." *Id.* at 3 (emphasis added by Defendants) (quoting ECF No. 24-3 at 7). Defendants, however, do not presently dispute Plaintiff's allegations that they knew at the time of contracting that Plaintiff would ship the product to a U.S buyer, that the only way Plaintiff's debt would be satisfied was through such a sale, or that, soon after entering into the agreement, Plaintiff reached a deal with a New York company to sell the expected product—allegations that satisfy Plaintiff's burden of production to show that the agreement contemplated performance in the United States. *See* ECF No.

37-1 at 2–5.  Defendants have therefore failed to rebut Plaintiff's arguments by a preponderance of the evidence.

Relying on *Guevara v. Rep. of Peru*, 608 F.3d 1297 (11th Cir. 2010), Defendants argue that Plaintiff's claim is "based on an alleged *failure* to act"—*i.e.*, Defendants' failure to ship the product—which is a "negative activity" that "cannot create the required 'direct effect.'"  ECF No. 28-1 at 19 (citing *Guevara*, 608 F.3d at 1309–10); *see also* ECF No. 37-1 at 4.  In *Guevara*, Peru had offered a reward for the capture of a fugitive, and the plaintiff gave information while he was in the United States that led to the fugitive's arrest.  608 F.3d at 1300–01, 1303–04.  When Peru failed to pay the reward, the plaintiff sued, arguing that Peru's failure to pay him in the United States had a direct effect there.  *Id.* at 1309–10.  While the Eleventh Circuit noted that "Peru's failure to make the reward payment within the United States" constituted a "negative activity" that likely failed to "satisf[y] the jurisdictional requirements of § 1605(a)(2)," it "decline[d] to reach that holding."  *Id.* at 1310.  Rather, the court based its holding on the fact that Peru had "promise[d] to pay the reward in Peru," not the United States.  *Id.* at 1301 n.4, 1309.  Thus, *Guevara* stands for the proposition that merely accepting a contract in the United States fails to give rise to direct effect.  It does not support Defendants' contention that failing to perform a contractual obligation "cannot create the required 'direct effect.'"  ECF No. 28-1 at 19.  Indeed, such a contention would run directly counter to the holdings of *de Csepel* and *Cruise Connections*, where the D.C. Circuit found that the failure to perform contractual obligations had a direct effect.  *See de Csepel*, 714 F.3d at 600–01; *Cruise Connections*, 600 F.3d at 663–66.

Furthermore, citing *Int'l Hous.*, 893 F.2d at 10–11, Defendants argue that there could be "no direct effect in the United States because . . . Plaintiff is a Jordanian company."  ECF No. 28-1 at 19.  The Supreme Court, however, has "reject[ed] [the] suggestion that the 'direct effect'

24

requirement cannot be satisfied where the plaintiffs are all foreign corporations with no other connections to the United States." *Rep. of Argentina v. Weltover*, 504 U.S. 607, 619 (1992). And although the Second Circuit in *Int'l Hous.* stated that "the fact that [the plaintiff] is a foreign corporation is relevant to whether the financial losses to [the plaintiff] constituted a 'direct effect' in the United States," the court clarified that there was no direct effect in that case primarily because the agreement did not contemplate performance in the United States. *See Int'l Hous.*, 893 F.2d at 11–12. Here, Plaintiff has adequately alleged that the parties contemplated performance in the United States because they knew that the sulfur and urea would ultimately be exported there. ECF No. 34 at 18–20.

In sum, if this Court finds that Defendants have retained their sovereign immunity, it should grant Defendants' Rule 12(b)(1) motion because the commercial activities exception is inapplicable, as Plaintiff's lawsuit is "based upon" only the Jordanian judgment, which was not an act taken in connection with either Defendant's commercial activities. If, however, this Court finds that Defendants have retained their immunity and that Plaintiff's lawsuit is "based upon" Defendants' commercial conduct, it should deny Defendants' Rule 12(b)(1) motion because Defendants' conduct had a direct effect in the United States, and the commercial activities exception therefore applies.

2.      Rule 12(b)(5)

Plaintiff attempted to serve Defendants by mailing an envelope containing copies of the summons and Complaint to the Iraqi Ministry of Foreign Affairs. ECF No. 9-1 at 2. Plaintiff does not dispute—and, indeed, an exhibit of the envelope clearly shows—that the envelope failed to identify the head of the Ministry of Foreign Affairs by name or title, as required by the FSIA. *See* ECF No. 34 at 26–30; ECF No. 9-1 at 2; *see also* 28 U.S.C. § 1608(a)(3). Defendants argue that

25

this failure constituted insufficient service of process. ECF No. 29-1 at 6–10. Defendants are correct. When serving a foreign state, the D.C. Circuit requires strict adherence to all of the FSIA's terms. Because Plaintiff has failed to adhere to these terms, service was improper.

The FSIA enumerates four methods for serving a foreign state. 28 U.S.C. § 1608(a)(1)–(4). Only the third method—28 U.S.C. § 1608(a)(3)—is at issue here. *See* ECF No. 29-1 at 7–10. Under section 1608(a)(3), a plaintiff properly effects service in relevant part "by sending a copy of the summons and complaint and a notice of suit . . . to be addressed . . . to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). A plaintiff must strictly adhere to this requirement. *See Barot v. Embassy of the Rep. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). Actual notice of the lawsuit cannot cure defective service. *Azadeh v. Gov't of Islamic Rep. of Iran*, 318 F. Supp. 3d 90, 100 (D.D.C. 2018).

Here, Plaintiff does not dispute that the envelope sent to the Iraqi Ministry of Foreign Affairs was not addressed to the head of the ministry. *See* ECF No. 34 at 26–30; ECF No. 9-1 at 2. Therefore, Plaintiff has failed to comply with section 1608(a)(3), and service was improper. *Cf. Barot*, 785 F.3d at 28–29 (noting that the plaintiff's service "contain[ed] a fatal, technical error" because she "did not address [the envelope] to the head minister," and further stating that "[t]he defect . . . came down to one line of the address block: it should have said 'Head of the Ministry of Foreign Affairs'"); *Arman Dabiri*, 2019 WL 231753, at *5 (holding that service was improper because the service envelope failed to include the name or title of the head of the relevant ministry, even though the ministry's address was correct). Plaintiff claims that addressing the envelope to the relevant ministry renders service proper under section 1608(a)(3), notwithstanding any failure to identify the head of the ministry. ECF No. 34 at 28–29. This argument, however, runs directly counter to section 1608(a)(3)'s plain language. *See* 28 U.S.C. § 1608(a)(3) (stating that a plaintiff

26

properly effects service "by sending a copy of the summons and complaint and a notice of suit . . . to be addressed . . . to the head of the ministry of foreign affairs of the foreign state concerned"); *Rep. of Sudan v. Harrison*, __ U.S. __, __, 139 S. Ct. 1048, 1057 (2019) ("[T]he most natural reading of § 1608(a)(3) is that the service [envelope] must bear the foreign minister's name . . . ."); *cf. Arman Dabiri*, 2019 WL 231753, at *5.

Plaintiff further argues that service should be deemed proper because the summons within the envelope was addressed to the "Minister of Foreign Affairs." ECF No. 34 at 28. For purposes of the FSIA, however, "[a] letter . . . is 'addressed' to an intended recipient when his or her name . . . is placed on the outside of the item to be sent." *Harrison*, __ U.S. at __, 139 S. Ct. at 1056. Plaintiff also contends that service was proper because Defendants do not dispute that they received copies of the summons and Complaint. ECF No. 34 at 29. But as noted previously, actual notice does not cure improper service. *Azadeh*, 318 F. Supp. 3d at 100; *see Harrison*, __ U.S. at __, 139 S. Ct. at 1058 (declining to interpret section 1608(a) as permitting service by any other method even "if reasonably calculated to give actual notice," and accordingly holding that service through actual delivery is, by itself, inadequate). Indeed, "*Harrison* [ ] forecloses the [ ] argument that actual delivery can cure technically deficient service." *Adetoro v. King Abdullah Acad.*, No 1:19-cv-01918 (TNM), 2019 WL 3457989, at *2 (D.D.C. July 30, 2019) (citing *Harrison*, __ U.S. at __, 139 S. Ct. at 1058). Thus, Plaintiff's arguments that service was proper are incorrect.

Nevertheless, if, as here, service was defective, a court may permit the plaintiff to reattempt proper service rather than dismiss the case. *Arman Dabiri*, 2019 WL 231753, at *5. Courts have particularly broad discretion to do so in cases involving service under the FSIA because "there is no statutory deadline for service" under the Act. *Barot*, 785 F.3d at 29. In fact, in such cases,

27

"dismissal is not appropriate when there exists a reasonable prospect that service can be obtained." *Id.* (quoting *Novak v. World Bank*, 703 F.2d 1305, 1310 (D.C. Cir. 1983)).

Courts consider three factors when deciding whether to permit a plaintiff to reattempt proper service under the FSIA: (1) whether the attempted service "came very close to satisfying the [FSIA's] requirements . . . [thus] showing good faith"; (2) whether the statute of limitations on the plaintiff's claim has run; and (3) whether the defendant has identified any "particular prejudice" that it would incur if the plaintiff were permitted to reattempt proper service. *Arman Dabiri*, 2019 WL 231753, at *5 (alterations in original) (citing *Barot*, 785 F.3d at 29). Here, those factors weigh in favor of permitting Plaintiff to reattempt proper service. The "failure to make any reference to the individual—whether by name or title—who occupies the office of the head of the ministry of foreign affairs as the addressee of the [envelope]"—which is exactly what occurred here—comes "very close to satisfying the [FSIA's] requirements . . . thus showing good faith." *Barot*, 785 F.3d at 29; *see Arman Dabiri*, 2019 WL 231753, at *5 (finding that "Plaintiff's attempt at service came 'very close' to satisfying § 1608(a)(3)" because "[t]he defect . . . came down to one line of the address block: it should have said 'Head of the Ministry of Foreign Affairs'") (alterations in original) (quoting *Barot*, 785 F.3d at 29)). Also, Defendants have not identified any harm that they would incur as a result of permitting Plaintiff to reattempt proper service. *See* ECF No. 28-1 at 30. The second factor admittedly weighs in Defendants' favor because neither party argues that the statute of limitations governing recognition of the Jordanian judgment has run, and thus Plaintiff could refile its claim after dismissal. *See Barot*, 785 F.3d at 29 (noting that the second factor weighs against dismissal when the statute of limitations has run); *see generally* ECF Nos. 28-1, 29-1, 33, 34. However, because the other two factors weigh in Plaintiff's favor, this Court should permit Plaintiff to reattempt proper service within a reasonable time. *Cf. Arman*

*Dabiri*, 2019 WL 231753, at \*5 (finding that dismissal was unwarranted—and accordingly permitting the plaintiff to reattempt proper service—where only the first and third factors were met).

       3.      Rule 12(b)(6)

Defendants seek dismissal for failure to state a claim under the UFCMJRA because Plaintiff has failed to allege in the Complaint that recognizing the Jordanian judgment would not violate U.S. and D.C. public policy. *See* ECF No. 28-1 at 32–34. In support of this contention, Defendants argue that the parties' contract constituted an attempt to evade U.S. sanctions prohibiting the importation of goods of Iraqi origin into the United States, and that therefore recognizing the Jordanian judgment would be repugnant to U.S. and D.C. public policy. *See id.* at 30–35. Both arguments, however, are unavailing on a Rule 12(b)(6) motion.

To state a claim under the UFCMJRA, the party seeking recognition of a foreign judgment must demonstrate that the judgment authorized or denied monetary payment and that the judgment was final, conclusive, and enforceable under the law of the nation that issued it. D.C. Code § 15-363(a), (c). The defendant then bears the burden of establishing the affirmative defense of repugnancy to public policy. *See Comm'ns Import Export, S.A. v. Rep. of Congo*, 118 F. Supp. 3d 220, 225–26, 228 (D.D.C. 2015). Here, Defendants do not dispute that the Jordanian judgment authorized monetary payment or that it was final, conclusive, and enforceable under Jordanian law. *See* ECF No. 28-1 at 30–35. Rather, Defendants argue that Plaintiff has failed to allege that recognizing the judgment would not violate U.S. and D.C. public policy. *See id.* at 32–34. This argument, however, provides no basis for dismissal under Rule 12(b)(6) because Plaintiff is "not required to anticipatorily negate" the affirmative defense of repugnancy to public policy. *McNamara*, 866 F.

Supp. 2d at 17; *see Chem-Met Co.*, 1997 WL 74541, at *2.  Accordingly, this Court should deny

Defendants' Rule 12(b)(6) motion.[10]

### III.   MOTION TO SET ASIDE ENTRY OF DEFAULT

Having found that this Court has subject-matter jurisdiction over this case and that it should

deny Defendants' motion to dismiss, the undersigned next considers Defendants' motion to set

aside entry of default.  For the reasons stated below, this motion should be granted.

This Court "must first address the threshold requirement set forth in Local Civil Rule 7(g)."

*Rep. of Kazakhstan v. Stati*, 325 F.R.D. 507, 509 (D.D.C. 2018).  That rule instructs that "[a]

motion to vacate an entry of default [ ] be accompanied by a verified answer presenting a defense

sufficient to bar the claim in whole or in part."  LCvR 7(g).  Defendants do not dispute that they

have failed to submit a verified answer along with their motion to set aside entry of default.  *See*

ECF No. 29-1 at 16–17.  They argue, however, that because service of process was improper, they

had no obligation to answer the Complaint.  *Id.* at 16.  Defendants are correct.  As discussed pre-

viously, Plaintiff's service was defective, so Defendants had "no obligation . . . to file any Answer

or other pleading."  *Koerner v. United States*, 246 F.R.D. 45, 48 (D.D.C. 2007).  Thus, they have

not run afoul of Local Civil Rule 7(g).  In any event, courts in this District "routinely allow de-

fendants to file a motion to dismiss in place of an answer despite a prior entry of default," and the

undersigned "is unaware of any decision in which a court has struck a motion to dismiss following

an entry of default because the motion to vacate the default was filed without an answer."  *Owens*

*v. Rep. of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005); *see Acree v. Rep. of Iraq*, 658 F. Supp. 2d

---

[10] Defendants' public policy arguments are best addressed on a motion for summary judgment after further briefing and development of the record.  *Cf. Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 99 (D.C. Cir. 2006) (considering public policy arguments in a foreign-judgment recognition claim on a motion for summary judgment as opposed to a Rule 12(b)(6) motion; *Comm'ns Import Export*, 118 F. Supp. 3d at 222, 228–30 (same); *LG Display Co. v. Obayashi Seikou Co.*, 919 F. Supp. 2d 17, 20, 29–32 (D.D.C. 2013) (same), *aff'd*, 615 F. App'x 954 (Fed. Cir. 2015); *Matusevich v. Telnikoff*, 877 F. Supp. 1, 2, 3–4 (D.D.C. 1995) (same), *aff'd*, 1998 WL 388800 (D.C. Cir. May 5, 1998).

124, 128 (D.D.C. 2009) (collecting cases where courts excused noncompliance with Local Civil Rule 7(g)). Accordingly, even if this Court finds that Plaintiff's service was proper and that therefore Defendants had an obligation to answer, this Court should excuse Defendants' noncompliance with Local Civil Rule 7(g).[11]

Turning to the merits of Defendants' motion, "[d]efault cannot be entered where there was insufficient service of process." *Darby v. McDonald*, 307 F.R.D. 254, 257 (D.D.C. 2014) (alteration in original) (quoting *Scott v. District of Columbia*, 598 F. Supp. 2d 30, 36 (D.D.C. 2009); *see Void-El v. O'Brien*, 811 F. Supp. 2d 255, 259 (D.D.C. 2011) ("Since no service was properly effected, [ ] the entry of default against Defendants was improper."). Plaintiff failed to effect proper service, so the Clerk's entry of default should be set aside. Nevertheless, for the sake of thoroughness, the undersigned will analyze whether good cause otherwise exists for a set-aside.

A court "may vacate 'an entry of default for good cause.'" *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 966 (D.C. Cir. 2016) (quoting Fed. R. Civ. P. 55(c)). The party seeking a set-aside bears the burden of demonstrating good cause. *Haskins v. U.S. One Transp., LLC*, 755 F. Supp. 2d 126, 129 (D.D.C. 2010). A court, however, must resolve all doubts in the movant's favor because "strong policies favor resolution of disputes on their merits." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) *see id.* at 835 (noting that "[d]efault judgments are not favored by modern courts"). These policies are heightened in cases involving foreign states, such

---

[11] Plaintiff attempts to distinguish *Africa Growth Corp. v. Rep. of Angola*, No. (BAH) 17-2469, 2018 WL 6329453, at *8 (D.D.C. Dec. 3, 2018)—where the court excused noncompliance—by claiming that, unlike the defendant in that case, Defendants have failed to make their arguments "abundantly clear" in their motion to dismiss. ECF No. 33 at 23 (quoting *Africa Growth*, 2018 WL 6329453, at *8). *Africa Growth*'s "abundantly clear" language, however, was dicta; the crux of the opinion was that, "[d]espite the local rule's text, '[c]ourts routinely allow defendants to file a motion to dismiss in place of an answer despite a prior entry of default, and indeed the 'Court is unaware of any decision in which a court has struck a motion to dismiss following an entry of default because the motion to vacate the default was filed without an answer.'" 2018 WL 6329453, at *8 (second alteration in original) (quoting *Owens*, 374 F. Supp. 2d at 9). Regardless, even if the "abundantly clear" standard applies, this Court should find that Defendants have met it because they have stated their grounds for dismissal with sufficient clarity.

31

that there is a "strong presumption against the entry of default judgment against a foreign state that has appeared in the case and expressed a desire to contest the claims." *Owens*, 374 F. Supp. 2d at 9; *see Acree*, 658 F. Supp. 2d at 127 ("[W]here, as here, the defendant is a foreign sovereign, default judgment is especially disfavored . . . ." (citing *Practical Concepts, Inc. v. Rep. of Bolivia*, 811 F.2d 1543, 1551 n.19, 1552 (D.C. Cir 1987))).  Here, because it is undisputed that Defendants are foreign states for purposes of the FSIA, and because Defendants have "appeared in the case and expressed a desire to contest the claims," this Court should presume that a set-aside is warranted. *Owens*, 374 F. Supp. 2d at 9.

Applying the factors that courts typically consider when evaluating whether good cause exists to set aside entry of default does not alter this presumption.  Those factors include whether "(1) the default was willful; (2) a set-aside would prejudice the plaintiff, and (3) the alleged defense was meritorious." *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980).  No single factor is dispositive. *See Africa Growth*, 2018 WL 6329453, at *6.  Courts may also consider equitable factors beyond those enumerated in *Keegel*. *See Gilmore*, 843 F.3d at 966 (stating that the "good cause" inquiry "is guided principally—but not exclusively—by the *Keegel* factors").

Most relevant to whether the default should be deemed willful here, courts have refused to find willfulness where service of process was defective. *See, e.g.*, *Darby*, 307 F.R.D. at 257 (finding no willfulness because the plaintiff failed to "rebut[ ] the allegation of improper service and [did] not provide[ ] proof of proper service"); *Void-El*, 811 F. Supp. 2d at 259 ("The default was not willful where Defendants, not having been served, had no duty to respond to the Complaint . . . .").  Because Plaintiff failed to effect proper service, Defendants' default should not be deemed willful, as they "had no duty to respond to the Complaint." *Void-El*, 811 F. Supp. 2d at 259.

32

Accordingly, Plaintiff's arguments that Defendants acted in bad faith by delaying their participation in this action are unavailing.[12]  *See* ECF No. 33 at 15–16.

Similarly, a plaintiff "is not prejudiced where [it] did not comply with the [applicable] Rules" for effecting proper service.  *Darby*, 307 F.R.D. at 257 (second alteration in original) (quoting *Void-El*, 811 F. Supp. 2d at 259).  Service was improper here, so Plaintiff has incurred no cognizable prejudice.  Even assuming that service was proper, Plaintiff argues only that Defendants' default has delayed payment under the Jordanian judgment.  *See* ECF No. 33 at 17–18. Courts have consistently rejected such arguments because "delay and legal costs are part and parcel of litigation and typically do not constitute prejudice for the purposes of Rule 55(c)."[13]  *Capital Yacht Club v. Vessel AVIVA*, 228 F.R.D. 389, 394 (D.D.C. 2005); *see Africa Growth*, 2018 WL 6329453, at *6 (finding no prejudice because "[w]hat the plaintiff characterize[d] as 'prejudice' [was] . . . at bottom no different from a mere delay in receiving the remedy sought").

For the third factor—whether the party seeking a set-aside has asserted a meritorious defense—courts need not decide likelihood of success on the merits.  *Keegel*, 627 F.2d at 374.  Instead, "Defendants' allegations are meritorious if they contain 'even a hint of a suggestion' which, proven at trial, would constitute a complete defense."  *Id.* (quoting *Moldwood Corp. v. Stutts*, 410 F.2d 351, 352 (5th Cir. 1969)).  Thus, "a meritorious defense is extremely easy to present." *Shatsky v. Syrian Arab Rep.*, 795 F. Supp. 2d 79, 84 (D.D.C. 2011) (internal quotation marks omitted).

---

[12] In addition to the *Keegel* factors, Plaintiff argues that this Court should consider Defendants' "unclean hands" in acting in bad faith by delaying their participation in this action.  ECF No. 33 at 22–23.  Plaintiff's arguments for "unclean hands," however, merely repeat its arguments for willfulness, which the undersigned has already addressed. *See id.*  Allowing Plaintiff to raise these arguments again would impermissibly double-count willfulness.

[13] Plaintiff points to a recent case from this District in which the court stated that "*unnecessarily* drawing out proceedings unfairly prejudices [a] plaintiff to some degree."  ECF No. 33 at 17–18 (quoting *Konoike Constr. Co. v. Ministry of Works, Tanzania*, No. 17-1986 (RJL), 2019 WL 1082337, at *3 (D.D.C. Mar. 6, 2019) (alteration in original) (internal quotation marks omitted)).  Unlike the plaintiff in *Konoike*, however, Plaintiff has offered no evidence beyond mere delay showing that Defendants have "unnecessarily" drawn out the instant proceedings.  *See Konoike*, 2019 WL 1082337, at *3; ECF No. 33 at 17–18.  Thus, *Konoike* is inapposite.

Courts have found that defenses of sovereign immunity and inapplicability of the FSIA's commercial activities exception satisfy this standard. *See, e.g.*, *Acree*, 658 F. Supp. 2d at 129 (finding a defense of foreign sovereign immunity meritorious for set-aside purposes); *Africa Growth*, 2018 WL 6329453, at *7 (finding a defense meritorious for set-aside purposes where the defendant alleged that the FSIA's commercial activities exception was inapplicable). These are precisely some of the defenses that Defendants have raised here. *See* ECF No. 28-1 at 15–30. Although this Court should reject Defendants' arguments about explicit waiver at this stage, they are nonetheless colorable and may prevail as the case proceeds; at the very least, "they contain [ ] a hint of a suggestion which, proven at trial, would constitute a complete defense." *Keegel*, 627 F.2d at 374. In its opposition, Plaintiff disputes the merits of those defenses. *See* ECF No. 33 at 19–22. But this is not the appropriate standard for determining merit for set-aside purposes. *See Keegel*, 627 F.2d at 374. Accordingly, this Court should find that Defendants have satisfied the third *Keegel* factor.

In sum, several considerations decisively weigh in favor of a set-aside. First, service of process was improper, which necessitates setting aside entry of default. Second, the D.C. Circuit has maintained a robust policy of avoiding default judgments and encouraging adjudication on the merits. *Jackson*, 636 F.2d at 835. Third, there is a "strong presumption" that a default entered against a foreign state that has "appeared in the case and expressed a desire to contest the claims" should be set aside. *Owens*, 374 F. Supp. 2d at 9. Fourth, all three *Keegel* factors—willfulness of default, prejudice to plaintiff, and meritorious defense—weigh in Defendants' favor. Thus, this Court should grant Defendants' motion to set aside entry of default.

## IV.    CONCLUSION

The undersigned **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 28) be **DENIED** because Plaintiff has stated an adequate claim for relief and alleged enough facts showing that Defendants explicitly waived their sovereign immunity.  The undersigned further **RECOMMENDS** that Plaintiff be permitted to reattempt proper service within a reasonable time, that Defendants' motion to set aside entry of default (ECF No. 29) be **GRANTED**, and that Plaintiff's amended motion for default judgment (ECF No. 24) be **DENIED AS MOOT**.

*        *        *        *        *

The parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  January 15, 2020

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE